**Angel CORREA, Plaintiff,**

v.

**CITY OF CHICAGO, Defendant.**

**No. 83 C 5471.**

United States District Court, N.D. Illinois, E.D.

June 26, 1985.

William J. Harte, Chicago, Ill., for plaintiff.

Jerold Solovy, Joseph Bisceglia, Jonathan Baum, Jenner & Block, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

Angel Correa ("Correa") has sued the City of Chicago ("City"), claiming Correa's firing as a City employee was impermissibly motivated by political considerations. After Honorable Nicholas Bua had conducted one day of a bench trial September 17, 1984, the case was transferred to this Court's calendar. By agreement the transcript of those proceedings was treated as part of the trial record before this Court, and the trial was completed March 28, 1985.

In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

### Findings of Fact

1. Correa is a resident, registered voter and taxpayer in the City of Chicago, Illinois (Tr. 1–55).[1] City is an Illinois municipal corporation.

2. On May 5, 1972 a consent decree (the "1972 Decree") was entered in *Shakman v. Democratic Organization of Cook County*, 356 F.Supp. 1241 (N.D.Ill.1972) ("*Shakman*"). By the terms of the 1972 Decree, its injunctive provisions are applicable to and binding upon City, its agents, servants and employees.

---

1. In these Findings citations to the transcript of the first day of trial (September 17, 1984) take the form "Tr. 1–55" (for example), while citations to the transcript of the second day of trial (March 28, 1985) take the form "Tr. 2—."

3. On June 20, 1983 another consent decree (the "1983 Decree") was entered in *Shakman.* Schedule G of the 1983 Decree listed certain City job titles (and corresponding job codes) that were to be exempt from the requirements of 1972 Decree ¶ E(1), such exemptions being established pursuant to 1983 Decree ¶ N:

N. *Exempt Positions.* The Governmental Employment positions under the control of the City of Chicago as listed in the attached Schedule of Exempt Positions are positions exempt from this Judgment and the 1972 Consent Judgment.

Jurisdiction was retained, under a decree entered contemporaneously with the 1983 Decree, to consider petitions by persons discharged or demoted from Schedule G exempted positions, if any such person requested "for good cause" that the position he or she occupied or had occupied be deleted from the Schedule.

4. One of the Schedule G listed exemptions was the position of Deputy Commissioner of Neighborhoods (Title Code 9710) in the Department of Neighborhoods ("DON"). DON was created by City ordinance effective January 1, 1980 (the "Ordinance"). DON's general duties, as set forth in the Ordinance, included (a) providing information and assistance in response to requests concerning governmental services, (b) informing the general public of the availability of governmental services and assisting the public in obtaining such services and (c) coordinating neighborhood improvement and self-help programs (Def.Ex. 2). In the performance of those duties, DON was directed by the Ordinance (a') to consult with community and neighborhood organizations throughout City and promote communication between such organizations in order to become aware of and assist in the resolution of neighborhood concerns, (b') to coordinate programs of such organizations and the various City agencies and departments designed to resolve neighborhood concerns and (c') to provide educational services to such organizations and the general public concerning services provided by the City (Tr. 2–12; Def.Ex. 2).

5. DON operated field service offices to process community concerns, to provide assistance to citizens and community groups and to initiate, coordinate and implement special programs geared to community needs (Tr. 2–39; Def.Ex. 5A). DON also conducted an Ethnic Outreach Program to deal with the special concerns of individual national groups (Def.Ex. 3). In substantial part DON was involved in types of activities that were sensitive and enabled City's Mayor and the incumbent administration to carry out their policy goals (Tr. 2–14, 81).

6. Deputy Commissioner of Neighborhoods was the third highest ranking position in DON. It carried an annual salary of $36,780, one of the highest in DON (Tr. 1–90, 112).

7. It is clear from all of the following that the position of Deputy Commissioner of DON authorized "meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation" (*Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), quoted in *Tomczak v. City of Chicago,* 765 F.2d 633, 640–641 (7th Cir.1985) ):

(a) DON's Deputy Commissioner was authorized to provide the Commissioner with input on which programs would best serve the community, and thus to help establish policy. He also acted as the liaison between the incumbent administration and the communities he served, where he spoke with the authority of a high administration spokesman (Tr. 1–76, 108, 112, 128–30).

(b) As the Mayor's representative in the community, the Deputy Commissioner was in a position and had the opportunity to undercut the administration's policy goals by failing properly to communicate its goals or by failing to address community disputes with requisite skill or in the manner expected by the administration, thus damaging the public perception of the administration and its abili-

ty to achieve its policy goals (Tr. 1–12, 31–32; Tr. 2–23–24, 26–27, 56–57, 79–81).

(c) Among other responsibilities, the Deputy Commissioner was properly expected to be capable of:

(1) managing and directing the activities of large numbers of DON personnel in all areas of City (and Correa's successor as Deputy Commissioner, Peter Earle, Jr. ("Earle"), did in fact do so) (Tr. 1–30, 50, 153; Tr. 2–23–24, 32, 39–41, 82);

(2) working closely with the Commissioner in developing DON policies (and Earle did in fact do so) (Tr. 1–30, 45, 50, 108; Tr. 2–40–41, 82);

(3) filling in for the Commissioner and speaking for him to community groups, City cabinet officers, representatives of the state and federal governments and the press (and Earle did in fact do so) (Tr. 1–12, 31–32, 107–08; Tr. 2–23–24, 27, 40–42, 56, 79–80);

(4) handling confidential or sensitive matters (and Earle did in fact do so) (Tr. 1–13; Tr. 2–24, 41); and

(5) proposing and formulating policies and programs and making decisions as to the allocation of resources and establishment of priorities in DON (and Earle did in fact do so) (Tr. 1–30, 45, 50, 107–08; Tr. 2–40, 82).

8. Correa was appointed as Deputy Commissioner of Neighborhoods by Mayor Jane Byrne in November 1979, effective January 1, 1980 (Tr. 1–60, 97). At that time Correa, who does not have a college degree, was 24 years old (Tr. 1–90).

9. Correa's employment before his appointment as Deputy Commissioner was with a hardware store, as a newspaper delivery manager and, for a few months after the 1979 election, with the Department of Human Services (Tr. 1–58–59, 91–92). During his brief tenure with the Department of Human Services Correa was suspended for several days without pay for unauthorized use of a city vehicle (Tr. 1–96) and received a below-average performance evaluation (Def.Ex. 21; Tr. 2–89–90). Be-

fore his appointment as Deputy Commissioner of DON, Correa had never supervised the operations of a staff of a considerable number of people (Tr. 1–153–54).

10. Immediately after Correa was appointed by Mayor Byrne as Deputy Commissioner, he was informed by Harry Sikorski, DON's then Commissioner, that even though Correa nominally had the title he was not going to function as a Deputy Commissioner (Tr. 1–107). Instead Correa functioned at the level of an outreach worker (Tr. 1–111; Tr. 2–31), and his work responsibilities were confined to one segment of City (Tr. 2–33). As Deputy Commissioner Correa did not perform all the functions normally expected of that position (Tr. 1–108; Tr. 2–31, 84, 86; Pl.Ex. 33; Def.Ex. 5).

11. Joseph E. Gardner ("Gardner") was appointed Acting Commissioner of DON May 23, 1983 (Tr. 2–11). After being appointed Gardner reviewed the duties and qualifications of DON's staff, beginning with upper management personnel. Gardner personally discussed their positions with them and requested a written memorandum from each discussing his or her duties. Based on that review Gardner concluded correctly that Correa (a) was not performing all the duties expected of a Deputy Commissioner and (b) was not qualified to perform at the level expected of a Deputy Commissioner (Tr. 1–21, 32, 36; Tr. 2–29–33, 68–71; Def.Ex. 5).

12. On July 13, 1983 Gardner terminated Correa as Deputy Commissioner effective July 22, 1983 (Tr. 1–18–19; Pl.Ex. 1). Thereafter Gardner appointed Earle to replace Correa as Deputy Commissioner. Earle has a bachelor's degree in sociology and social welfare and had served as an administrator of neighborhood and community organizations for several years at the time of his appointment. Earle was qualified to and did perform the duties expected of a Deputy Commissioner in a way Correa was not capable of doing and had not done (see Finding 7(c)) (Tr. 1–47; Tr. 2–37, 58; Def.Exs. 8, 8–A, 8–B, 8–C).

13. Gardner terminated Correa because Correa lacked the skills, background and experience necessary to perform the proper and expected functions of a Deputy Commissioner (Tr. 2–33–34, 60, 62). Gardner did not terminate Correa for political reasons. He never asked Correa about his political affiliations and did not know what they were. Had Correa been a supporter of Mayor Harold Washington, Gardner would still have terminated him. Correa was never told by anyone his termination was politically motivated. No credible evidence would support a finding of political motivation for such termination (Tr. 1–23–24, 141–42; Tr. 2–36, 62).

14. Between the election of Harold Washington as City's Mayor and the elimination of DON by action of the City Council effective December 31, 1983, only 4 of 16 persons employed in exempt positions in DON were discharged by Gardner. As to the other 12 retained by Gardner, his decisions to retain them were unaffected by the fact he assumed or actually knew many of them had supported Jane Byrne in the 1983 mayoral primary election (Tr. 1–44, 47; Tr. 2–43, 46, 74–75).

15. DON was abolished by the City Council effective December 31, 1983. While some of DON's functions were transferred to the Mayor's Office of Inquiry and Information, its outreach functions were eliminated. That abolition action was taken by the City Council even though (or perhaps because) the Mayor viewed DON as the "flagship" by which to increase City's levels of cooperation and partnership. No position exists in the Mayor's Office of Inquiry and Information with functions similar to those performed by Correa and Earle (Tr. 2–46, 48, 50, 52; Def.Ex. 10).

16. In summary:

(a) Deputy Commissioner of DON was a position exempt from restrictions on politically based employment decisions.

(b) Gardner's decision to terminate Correa as Deputy Commissioner was not based on political considerations in any event.

## Conclusions of Law

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and pursuant to the retention of jurisdiction in *Shakman* (see the last sentence of Finding 3).

■ 2. Determination whether "[political] affiliation is an appropriate requirement for the effective performance of the office" (*Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980)) as the Deputy Commissioner of DON "require[s] examination of the powers inherent in [that] office, as opposed to the functions performed by a particular occupant of that office" (*Tomczak*, at 640).

■ 3. Deputy Commissioner of DON was a position for the effective performance of which political affiliation is an appropriate requirement—or to put the standard in different though legally equivalent terms, it was a position properly exempt from inquiry whether employment decisions concerning that position were based on political affiliation—because:

(a) It involved policy to such a degree and was so confidential in nature with regard to policy that it should properly be so exempt. See *Elrod v. Burns*, 427 U.S. 347, 368, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976); *id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring in the judgment).

(b) It authorized, both directly and indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation. *Nekolny*, 653 F.2d at 1170; *Tomczak*, at 641.

(c) It conferred on its occupant the type of discretion that could be used to thwart the goals, and obstruct the implementation of policies, of City's Mayor and his administration. *Elrod*, 427 U.S. at 367, 96 S.Ct. at 2686.

4. Abolition of DON after Correa's termination (and while his successor was serving as Deputy Commissioner) does not in any way indicate Correa's termination was politically motivated. *Tomczak*, at 643. Indeed, even if it could so indicate, in this

instance such abolition ran counter to the goals of City's Mayor and his administration.

5. Deputy Commissioner of DON (Title Code 9710) was properly classified as an exempt position under Schedule G of the 1983 Judgment.

6. Correa's inability and failure to carry out the full range of functions properly attributable to, and the powers inherent in, the office of Deputy Commissioner of DON is irrelevant to the foregoing Conclusions. It is however relevant to a conclusion whether political affiliation was a substantial or motivating factor in Correa's termination from that office.

7. Correa has failed to carry his burden of establishing, even by merely a preponderance of the evidence, that political affiliation was a substantial or motivating factor in his termination. Indeed, there is no credible evidence indicating political affiliation was a factor in Correa's termination at all. City has carried its burden of establishing Correa would have been terminated in any event for reasons not based on political affiliation.

\* \* \* \* \* \*

It is therefore ordered and adjudged that plaintiff Angel Correa take nothing and that this action be dismissed on the merits. Defendant City of Chicago shall recover of Correa its costs of action.