**Bonnie RATEREE, et al., Plaintiffs,**

v.

**Damon ROCKETT, et al., Defendants.**

No. 85 C 4700.

United States District Court,
N.D. Illinois, E.D.

Feb. 26, 1986.

As Amended March 10, 1986.

Alan M. Freedman, Bruce H. Bornstein, Freedman & Bornstein, Chicago, Ill., for plaintiffs.

William J. Holloway, Jennifer S. Craigmile, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Bonnie Rateree ("Rateree"), Kenneth Vaughn ("Vaughn"), William Gardner ("Gardner"), Leander Brown ("Brown") and Renee Gholson ("Gholson") sue the City of Harvey, Illinois ("City") and four City officials—Commissioners Damon Rockett ("Rockett"), Frank Piekarski ("Piekarski") and Otis Gilmore ("Gilmore") and City Clerk Walter Johnson ("W. Johnson")—under 42 U.S.C. § 1983 ("Section 1983"), claiming violations of plaintiffs' First and Fourteenth Amendment rights.[1] Amended Complaint ("Com-

---

1. As this Court has frequently remarked, precision would require all such claims against "state actors" to be labeled solely in Fourteenth Amendment terms. As a matter of convenience (and to assist in the exposition of due process claims that draw their substance from the Bill of Rights), this opinion will follow the universal (though technically inaccurate) practice of citing to the underlying Bill of Rights provision, even though its incorporation by the Fourteenth Amendment is what plaintiffs really rely upon.

plaint") Count I alleges (1) all plaintiffs were harassed because of their political views while City employees and (2) all plaintiffs except Gholson were eventually fired for purely political reasons. Count II claims W. Johnson withheld vacation-pay checks due Rateree, Vaughn and Gardner in an improper attempt to inhibit the exercise of their due-process rights to bring this lawsuit. Plaintiffs seek declaratory relief (as to Count I only), injunctive relief and compensatory and punitive damages.

All defendants now join in motions:

1. to dismiss under Fed.R.Civ.P. ("Rules") 12(b)(6) and 56;[2] and

2. for sanctions, costs and attorneys' fees under Rule 11 and 28 U.S.C. § 1927 ("Section 1927").

For the reasons stated in this memorandum opinion and order, defendants' motion to dismiss is granted in part and denied in part, and their motion for sanctions is denied.

### Facts [3]

In May 1983 City elected David Johnson ("D. Johnson") as its first Black mayor. Plaintiffs all "supported and campaigned for" D. Johnson and his ticket-mate Ernestine Berry-Beck ("Berry-Beck"), whose run for City Commissioner was also successful (Complt. and Ans. ¶¶ 10, 11, 13, 14). Gilmore also ran for City Commissioner on D. Johnson's ticket and was elected (Pl.Stmt. Genuine Iss. ¶ 3).[4] During the same election, plaintiffs all campaigned against Rockett and Piekarski and supported their

opponents for City Commissioner slots. Rockett and Piekarski won (Complt. and Ans. ¶ 12).

City operates under the commission form of government (Ill.Rev.Stat. ch. 24, ¶ 4–3–1). Its legislative body is a city council ("Council") comprising four commissioners ("Commissioners") and the Mayor, with each having one vote. Commissioners and the Mayor are elected at large (*id.* ¶ 4–3–2).

Soon after his election, D. Johnson appointed Rateree as his "Special Assistant" (Complt. and Ans. ¶ 16; Def.Stmt. Undisputed Facts ¶ 10). According to D. Johnson July 19, 1985 Aff. ¶ 8:

Bonnie Rateree is my chief administrative aide and confidential employee .... She is competent and manages the day-to-day operations of my department as well as designing and implementing programs that meet the needs of our city's unemployed, homeless and hungry.

Rateree described her duties (Int.Ans. 4(f)[5]) in similar terms:

Assist the mayor in managing the Department of Public Affairs and the Office of Mayor. Assist in the development of the departmental goals and objectives and supervising of staff. Assist the Mayor in his public relations activities and coordinate human services for Harvey citizens in crises.

In September 1983 D. Johnson appointed Vaughn as Coordinator of Economic Development. D. Johnson July 19, 1985 Aff. ¶ 9 says:

---

**2.** Rule 12(b)(6) motions are of course pleading-oriented. Where as here a movant presents matters outside the pleadings, Rule 12(b) gives the court alternative options: It may ignore those matters and decide the motion purely on the sufficiency of the complaint, or if the court wishes:

the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Defendants' "motion to dismiss" is really intended as one for summary judgment, and the significance of that distinction for this case will be discussed later in the text.

**3.** Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovants—here plaintiffs. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). Throughout this opinion the recitals of facts adhere to those principles.

**4.** Nothing in the record indicates whether or not plaintiffs campaigned for Gilmore.

**5.** Citations to plaintiffs' responses to defendants' interrogatories will take the form "Int.Ans.—."

Kenneth Vaughn who has handled economic development for the City is vitally important to my administration being able to address the issues of employment, industrial retention and the management of the Dixie Square Tax Increment Financing District. Mr. Vaughn and Bonnie Rateree successfully coordinated the recent visit of a delegation of Chinese mayors to Harvey and his work with local executives in all of our major industries have [sic] proven valuable and necessary in our present negotiations with large industrial enterprises.

Vaughn described his duties (Int.Ans. 5(f)) as:

Initiate programs and services to encourage development of new businesses and expansion and extension of existing businesses. Coordinate with other government and private agencies to insure maximum participation in state, county and federal programs geared toward Harvey's economic development needs.

In September 1983 D. Johnson also appointed Gardner as Coordinator of Housing (Project Manager). D. Johnson July 19, 1985 Aff. ¶ 10 says:

[Gardner] has successfully implemented the Homestead Program, which provides housing to eligible citizens through an annual lottery. He is the administrator for the newly developed HERO program which is in its final developmental stages of becoming a private-public partnership between government and local bankers to provide low-interest rehabilitation loans to eligible citizens.

City's official job description for Gardner's position (Int.Ans.Ex. D) read:

Responsible for management of departmental projects as assigned by the Director [of Planning and Development]. Exercises discretion as how to meet project goals and meet project schedules. Has authority to use Code Enforcement

officer and Community Development Administrator as staff for federally-funded projects and the Project Management Division secretary as a staff administrator for all projects.

\* \* \* \* \* \*

As senior staff within the Project Management Division, the project manager exercises independent judgment as how and when to schedule project tasks. Most of the time he or she acts as both an administrator and technician to carry out the objectives of a project. Accountability for project performance is directly to the Director.

Dealings with Commissions and Department Heads is [sic] only with the express knowledge and consent of the Director.

Neither Vaughn nor Gardner reported directly to D. Johnson. Each reported instead to the City Planner (D. Johnson July 19, 1985 Aff. ¶ 10).

In late December 1983 D. Johnson hired Brown as Employment and Training Coordinator (Complt. and Ans. ¶ 19; Def.Ex. I, at 3). Nothing in the record describes Brown's duties or responsibilities.

Gholson was hired in February 1984 (though it is unclear from the record who hired her) as Vaughn's secretary (Int.Ans. 8(a), 8(f)). She says (id.) her duties:

included being secretary to the Coordinator of Economic Development. Responsibilities included typing, filing, intercepting phone calls, etc.

All plaintiffs' jobs (with the possible exception of Brown's [6]) were positions created by City's 1983–84 budget (Int.Ans. 4(a)–(d); 5(a)–(d); 6(a)–(d). Their initial salaries were:

| Rateree: | $25,000 (Int.Ans. 4(e) Ex. A) |
| Vaughn: | $29,251 (Int.Ans. 5(e) Ex. B) |
| Gardner: | $28,632 (Int.Ans. 6(e) Ex. C) |
| Brown: | Not stated |
| Gholson: | $13,500 (Int.Ans. 8(e)). |

6. As the text has earlier stated, nothing about Brown's job has been submitted other than his title and hiring date. Though all other plaintiffs answered defendants' interrogatories, the only response to the Brown-related interrogatory (Int. 7) is "To be answered at a later date." Any further answer (if one were indeed given) has not been tendered to this Court.

Those salaries were adjusted during fiscal 1983–84.

Then on July 23, 1984 Council passed City's 1984–85 budget ordinance (Def.Ex. D). Appropriations for the jobs held by all plaintiffs[7] were cut out of that budget entirely. Rockett, Piekarski and Gilmore voted for the 1984–85 ordinance, while D. Johnson and Berry-Beck voted against it.

Rateree, Vaughn, Gardner and Brown were removed from City's payroll in July 1984, while Gholson was transferred to a secretarial position under Berry-Beck (Int. Ans. 15(a)). In December 1984 Rateree, Vaughn and Gardner were rehired: Rateree as Administrative Manager to the Mayor, Vaughn as Project Manager of Economic Development and Gardner as Project Manager of Housing. Funding for Rateree's job came from a line item ("Secretary and Other") in D. Johnson's budget, while Vaughn's and Gardner's jobs were created by Berry-Beck and funded from her budget (Int.Ans. 11(a)–(c); 12(a)–(c); 13(a)–(c)). Brown was never rehired (Complt. and Ans. ¶ 31).

Plaintiffs filed this lawsuit May 15, 1985. At that time they claimed they were being "harassed" by Rockett, Piekarski and Gilmore and were under imminent threat of discharge, all "because of their political affiliations" (Orig.Complt. ¶¶ 35–36). Nothing happened to them, however, until City's 1985–86 budget ordinance was passed July 11, 1985 (Rockett, Piekarski and Gilmore voting in favor, D. Johnson and Berry-Beck against). That ordinance (Def.Ex. E) contained further cuts affecting plaintiffs: "Secretary and Other" was deleted as a line item from D. Johnson's budget, eliminating funding for Rateree's job. Funding for Vaughn's and Gardner's jobs was also withdrawn.[8] As of July 22, 1985 Rateree, Vaughn and Gardner thus joined Brown among the ranks of ex-City employees.

Rateree, Vaughn and Gardner believed they were entitled to accrued vacation pay. On July 26 W. Johnson, who as City Clerk had responsibility for computing and issuing payroll checks (W. Johnson Dep. 9–10), had prepared vacation-pay checks for Rateree, Vaughn and Gardner. However, Piekarski (who had replaced Berry-Beck as Commissioner of Accounts and Finance (Complt. and Ans. ¶ 39)) refused to authorize W. Johnson to issue those checks (W. Johnson Dep. 36).

On August 5, 1985 Rateree, Vaughn and Gardner sent identical letters to D. Johnson (Def.Ex. F):[9]

> If I don't receive my approved vacation pay today (August 5, 1985) I will take appropriate legal action.

Those letters got action. One day later W. Johnson sent the checks ($872.21 to Rateree, $412.10 to Vaughn and $87.99 to Gard-

---

**7.** Although defendants admit Rateree's, Vaughn's, Gardner's and Brown's jobs were cut out of the 1984–85 budget, they deny that was so as to Gholson (Complt. and Ans. ¶¶ 28–32). Comparison of the 1983–84 budget ordinance (Def.Ex. J) and the 1984–85 budget ordinance (Def.Ex. D) shows the 1983–84 line item under "Planning & Building" labeled "Salary—Inspectors & Secretary" became, in 1984–85, "Salary—Inspectors." But the 1984–85 budget contained a new line item, "Salary—Office Manager & Clerical." Whether or not that item would include Gholson's position is, in the present state of the record, a matter of speculation only.

**8.** This Court's effort to parse the budget ordinances has not identified either the funding source for Vaughn and Gardner in 1984–85 or the line item(s) from which that funding was cut in 1985–86. Of course that task was not appropriately thrust on this Court, but the liti-

gants have failed to point out the items (as they should have). Def.Ans. to Pl.Int. 1 says the positions entitled "Administrative Assistant to the Mayor," "Coordinator of Economic Development," "Coordinator of Housing" and "Employment and Training Coordinator" were eliminated from the 1985–86 budget, but those job titles were not listed in the previous budget in any event. As this opinion will discuss later, plaintiffs do not dispute their job terminations having been accomplished via budget cuts. Instead they claim those cuts were motivated by political, rather than economic, concerns.

**9.** Def.Ex. F includes only the Gardner and Rateree letters (Exs. 8 and 9 to W. Johnson Dep.). But W. Johnson Dep. 27 indicates three letters (Exs. 7, 8 and 9) were received, including Vaughn's too. None of the W. Johnson Dep. exhibits is attached to the copy of that deposition filed with this Court.

ner (Def.Ex. H), each with an identical cover letter (Def.Ex. G):

Enclosed please find "vacation pay" requested. The City is submitting said money in settlement of a dispute between the City and the employee. The City reserves all rights.

W. Johnson Dep. 44 says the "dispute" to which he referred was plaintiffs' August 5 threat of "appropriate legal action" as to the vacation pay itself. Rateree, Vaughn and Gardner did not cash their checks, however, fearing doing so would compromise their rights in the lawsuit pending in this Court. On August 19, 1985 plaintiffs amended their original complaint by adding Count II for injunctive relief and damages due to (¶ 14):

extreme hardship caused by the inability to cash the checks while presently unemployed.

After receiving "volunteered" advice from City's legal counsel (W. Johnson Dep. 51), W. Johnson on August 24 sent letters to Rateree, Vaughn and Gardner (id. 49–50, 75):

Please be advised that the City of Harvey's letter of August 6th, 1985, to you regarding your vacation pay was not and is not in any way intended to limit, settle, or prejudice your right to bring, maintain, or continue any legal actions against the City of Harvey.

Rateree, Vaughn and Gardner cashed their checks August 27, 1985 (see Def.Ex. H).

### Plaintiffs' Theories

Plaintiffs allege they were harassed and ultimately "terminated" by defendants because of their support for D. Johnson and Berry-Beck. They claim Rockett, Piekarski and Gilmore—the so-called Council "majority bloc"—was anti-D. Johnson and was aligned with Walter Mondale in the 1984 presidential race, while D. Johnson, Berry-Beck and plaintiffs all supported Jesse Jackson's candidacy (Rateree was elected as a "Jesse Jackson/Harold Washington favorite son" delegate to the 1984 Democratic Convention, while Rockett, who ran as a Mondale delegate, was not elected (Rateree Dec. 21, 1985 Aff. ¶ 1) ).

Plaintiffs conclude their ultimate separation from City employment had nothing to do with budgetary demands, for their aggregate salaries amounted to only $100,000 or so as against City's deficit (even after the cuts) of over $1.2 million (D. Johnson July 19, 1985 Aff. ¶ 5). D. Johnson July 19, 1985 Aff. ¶ 11 says:

There are many places in the budget where cuts might have been made without eliminating valuable personnel assigned to important projects if this was not politically motivated. For example, Commissioner Piekarski has $57,000 in contingencies that are unexplained.

Both D. Johnson Dec. 21, 1985 Aff. ¶ 5 and Rateree Dec. 21, 1985 Aff. ¶ 2 say they were told by City's corporation counsel Barry Moss ("Moss") and Steven Bloomberg ("Bloomberg") that the adverse budget action was "politically motivated" or "for political reasons rather than budget constraints."

Thus, at least as to Rateree, Vaughn and Gardner, D. Johnson concludes (D. Johnson July 19, 1985 Aff. ¶¶ 8–10) each was harassed "solely" because of support for him and for Jesse Jackson. Gholson, who is still on the City payroll, claims she is being harassed for her loyalty to D. Johnson (Gholson Aff. ¶¶ 5–7):

5. My desk was moved four times in one month.

6. My position as union steward was challenged by my superior. I was given additional duties with no additional compensation.

7. I was told that my work was not satisfactory and I was threatened with discharge by my superior for even questioning these actions.

As to Count II plaintiffs' premise is simply stated. They sue both W. Johnson and City on the theory both the original withholding of vacation pay and then the conditional delivery of checks were intended to chill their free access to the courts to pursue their Count I lawsuit.

### Defendants' Theories

Defendants' motion presents four bases for summary judgment as to Count I:

1. Rockett, Piekarski and Gilmore are absolutely immune from suit because their actions were taken in their capacities as legislators.

2. City is immune from respondeat superior liability because plaintiffs have made no showing the terminations were pursuant to City's "policy" in *Monell* terms.

3. Rateree, Vaughn and Gardner were "policymakers" who *could* be fired for political reasons under the exception created by *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

4. In any event, plaintiffs have not made out a prima facie case of politically-motivated action. Defendants' concerns were solely budgetary.

As to Count II defendants argue:

1. W. Johnson is entitled to qualified good-faith immunity for his ministerial acts.

2. City is immune under *Monell.*

3. Plaintiffs' claim is now moot because they have cashed their checks.

### Count I

#### 1. Legislative Immunity [10]

As defendants view the facts, Rateree, Vaughn, Gardner and Brown were not fired. Instead, their jobs were eliminated from City's budget pursuant to budget ordinances passed by City's "legislature." Defendants therefore argue *Reed v. Village of Shorewood*, 704 F.2d 943, 952–53 (7th Cir.1983) renders Rockett, Piekarski and Gilmore, as municipal legislators, absolutely immune from Section 1983 liability.

*Reed* took the seemingly inevitable step of extending to municipal legislators the Section 1983 immunity granted to state legislators by *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) and to regional legislators by *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979). Of course such immunity does not extend to legislators for everything they may do. Immunity rather applies only to "legislative action" (*Reed*, 704 F.2d at 952) taken "in the sphere of legitimate legislative activity" (*Tenney*, 341 U.S. at 376, 71 S.Ct. at 788) or (the same concept phrased differently) "in a legislative capacity" (*Lake Country*, 440 U.S. at 405, 99 S.Ct. at 1179). Before Rockett, Piekarski and Gilmore become entitled to invoke *Reed*, this Court must first determine their acts concerning plaintiffs were "legislative"—a question *Reed* itself does not answer. As *Coffey v. Quinn*, 578 F.Supp. 1464, 1465 (N.D.Ill. 1983) said:

> Immunity questions must be determined not by the labels of the officers whose acts are under scrutiny but by the nature of these acts.

Twin rationales define the proper scope of legislative immunity: the need for legislative freedom and the political check on bad legislation. As to the first of those *Tenney*, 341 U.S. at 377, 71 S.Ct. at 788 teaches:

> The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative

---

**10.** At the outset plaintiffs urge immunity is an affirmative defense defendants neglected to plead. That position must be rejected, though it is true the Answer contains no affirmative defenses denominated as such. Complaint ¶ 42 (¶ 39 of the original Complaint) alleged:

> that all of the activities and conduct of the defendants alleged above were politically motivated.

Defendants' responsive Answer ¶ 39 read:

> Denied and defendants state further that the same are not subject to judicial review.

In essence, a Section 1983 municipal legislative immunity defense asserts not that the acts charged are innocuous, but rather that a federal court is not the place in which to challenge them (see text that follows). Accordingly, defendants' answer suffices to assert such a defense. Rule 8(c) does not require affirmative defenses to be labeled as such: It says only that they must be "set forth." That much defendants have done.

duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon the conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in *Fletcher v. Peck*, 6 Cranch 87, 130 [3 L.Ed. 162], that it was not consonant with our scheme of government for a court to inquire into motives of legislators, has remained unquestioned.

As to the second factor, *Reed*, 704 F.2d at 952–53 somewhat elliptically suggests the public is safeguarded against the "arbitrary action" of legislators by its power at the ballot box. That reflects a notion that legislators whose motives or morals are questionable can be voted out of office and their mischief undone.[11] In an extension (or perhaps simply an application) of the economic theory of lawmaking, that potential threat of removal is supposed to press legislators to align their interests with the public's.

Certainly the purely private act of a legislator (murdering a constituent, to pose an outre example) does not involve debatable public-policy considerations, nor are most purely private acts (even of a less outrageous type) likely to affect enough people to awaken public opinion. Section 1983 immunity therefore does not apply to purely private acts. Even apart from such extreme cases, well-established (if murky) doctrine indicates some legislative enactments, if they affect particular and not general interests, are "administrative" and not "legislative." In those situations, too, absolute Section 1983 immunity is not available (see *Coffey*, 578 F.Supp. at 1465–67).

Plaintiffs urge their terminations were administrative acts, amounting simply to specific personnel decisions, even though accomplished by general ordinance. As

*Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir.1984) said, quoting *Developments in the Law—Zoning*, 91 Harv.L.Rev. 1427, 1510–11 (1978):

> If the action involves establishment of a general policy, it is legislative; if the action "single[s] out specifiable individuals and affect[s] them differently from others", it is administrative.

See also *Detz v. Hoover*, 539 F.Supp. 532, 534 (E.D.Pa.1982) (emphasis in original) (municipality's employment decisions are "essentially *administrative* in nature, this notwithstanding the fact that a legislative body is the responsible decisionmaker").

■ But plaintiffs' contention fails to come to grips with the fact their jobs actually ceased to exist as a consequence of City's general budget ordinance, enacted to cope with a substantial deficit. *Goldberg v. Village of Spring Valley*, 538 F.Supp. 646, 650 (S.D.N.Y.1982) ("*Goldberg II*") is right on point. There a victorious slate of village trustees voted to transfer urban-renewal funds from a separate urban-renewal agency to the village itself, eliminating the jobs of agency counsel and agency director—jobs held by active political opponents of the newly-elected trustees (see the earlier opinion in *Goldberg*, 538 F.Supp. 641, 642 (S.D.N.Y.1982) ("*Goldberg I*")). Though the *Goldberg* plaintiffs alleged (*id.*) the transfer of agency funding was purely a smokescreen to mask political reprisals against them, *Goldberg II*, 538 F.Supp. at 650 (footnote omitted) held the trustees were entitled to absolute Section 1983 immunity:

> The acts of the Trustees complained of were the creation of the Department of Housing and Community Development, the transfer of the funds and programs of the Spring Valley Urban Renewal Agency to the Village, and the approval of the appointments of individuals to positions that performed the duties previously performed by plaintiffs. These acts were clearly within the scope of the

---

11. Potential ballot-box curbs, however, may be a sufficient but not a necessary predicate for legislative immunity. Nothing in *Lake Country* indicates the regional planning agency officials involved there were popularly elected.

Trustees' authority under [state law]. Further, the steps taken by the Trustees were traditional legislative acts, reflecting policy objectives. None of those acts were executive or administrative. The Trustees are therefore entitled to absolute immunity from suit under § 1983.

While that analysis is somewhat conclusory,[12] it is fully applicable here. Budgetmaking is a quintessential legislative function, reflecting the legislators' ordering of policy priorities in the face of limited financial resources. When budgets are cut materially in an industry as labor-intensive as that of local government, some people will almost surely lose their jobs. But that does not convert a budget cut into an "administrative" employment decision, for at least two reasons:

1. Ordering budget priorities is a complex process subject to many pressures and resulting in many compromises. Budgets are written to the clangor of many axes grinding. Money may be withdrawn from project A simply because it must be added to project B, though some or many people may think project A the more important. Plaintiffs argue other line items should have been cut instead of plaintiffs' salaries, but that merely reflects their own set of priorities. Each line item in a budget may affect the interests of a few people intensely, but a budget expresses general policy by balancing the competing claims of hundreds or thousands of line items. Viewed through plaintiffs' microscope, a "legislative" budget decomposes into hundreds or thousands of "administrative" actions. That is a false perspective on the general policymaking function the budgetmaking process involves.

2. Budgetmaking is highly political in the broadest sense. Especially at the local level, the budget may be the single most controversial job legislators undertake. When a project is cut from the budget and an employee let go, that is not simply the loss of an employee. It is also the entire loss of a project or a set of services. Plaintiffs do not dispute defendants' statement that no one was hired to replace them (Def.Ans. to Pl.Int. 4(b)), so this is not simply a case of substituting "loyalists" for outsiders. In that sense defendants' actions are not really "employment decisions" in *Detz* terms. When a program or an office is cut out of the budget, that tends to be a matter of more general concern to the public than the mere substitution of functionary A for functionary B. Thus the element of the ballot-box check comes more strongly into play, and the rationale for disfavoring judicial second-guessing of the budgetmaking process applies.

This Court cannot be (nor does it wish to be) deaf to plaintiffs' assertion that the budget cuts constituted an attempt to chill their First Amendment rights. But as the Court said in *Tenney,* 341 U.S. at 378, 71 S.Ct. at 789 (footnote omitted):

> In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies.

Legislative immunity does not sanitize legislators' motives—it rather makes them irrelevant on the ground courts are not to probe them at all. That is the difference between "absolute" *legislative* immunity and the "qualified good-faith immunity" available to legislators acting in an administrative capacity (*Wood v. Strickland,* 420 U.S. 308, 315–22, 95 S.Ct. 992, 997–1001, 43

**12.** *Coffey,* 578 F.Supp. at 1466 incorrectly says *Goldberg II* did not decide whether a job termination was legislative or administrative. But *Goldberg II* must be read together with *Goldberg I,* which gave the essential facts forming the basis of the Section 1983 claim (see *Goldberg II,* 538 F.Supp. at 647, referring to facts set out in *Goldberg I* and not repeated in *Goldberg II*). *Goldberg I,* 538 F.Supp. at 642, 644, 645–46

made it abundantly clear plaintiffs were charging the trustees' funding transfer ordinance was simply a pretext for politically-motivated firing. *Goldberg II,* 538 F.Supp. at 650 then decided the trustees' actions were "traditional legislative acts, reflecting policy objectives" and were not "executive or administrative," so that absolute immunity insulated the trustees from suit.

L.Ed.2d 214 (1975)). To find a bad-faith motivation and then use that to inform the "legislative" v. "administrative" determination would be to conflate the two types of immunity.

Put another way, an improper motive does not turn a legislative act into an administrative one. Only once a court determines an act's character is administrative—that is, not involving a balance of policies and not having general ramifications—does the question of motive become relevant. Here it is not.

Thus plaintiffs' wrongful-termination claims against Rockett, Piekarski and Gilmore individually must be dismissed. This dismissal does not, however, automatically eliminate the political-harassment claims advanced in Count I—not only by Gholson (as to whom that is the only claim) but by the now-terminated plaintiffs. If that seems anomalous—swallowing the camel (the dismissal of the wrongful-termination claim) while straining at the gnat (the non-dismissal of the harassment-during-employment claim)—it is only because the budgetary ordinance process is so classically legislative in the present context.[13] More of this, however, later.

### 2. Municipal Liability

 Municipalities enjoy no general Section 1983 immunity (*Owen v. City of Independence, Missouri*, 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980)). Policies supporting absolute or good-faith personal immunity do not apply to municipalities sued under Section 1983 (*id.* at 654–56, 100 S.Ct. at 1417–18). But municipalities necessarily act only through their human agents, and both sides agree *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) provides the test:

We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Def.R.Mem. 26 argues even if plaintiffs' jobs were taken away for political reasons plaintiffs have established only an isolated incident: City then has no "municipal policy or custom" to trigger *Monell* liability. That argument wholly misperceives the conceptual underpinning for *Monell*: simply that Section 1983 liability must attach directly and not vicariously. For example, where an individual police officer beats up a citizen, *Monell* demands an answer to the question whether that beating was an isolated incident (thus negating municipal liability) or part of a municipal policy favoring beatings (thus creating municipal liability). But here plaintiffs were terminated pursuant to an action of Council—the very organ that sets policy for City. Defendants' insistence that the "firings" were actually budget cuts only reinforces plaintiffs' position: Council's acts "may fairly be said to represent official policy" in *Monell* terms.

 Individual immunity for Rockett, Piekarski and Gilmore, established in the preceding section of this opinion, has not been based on a judgment that no unconstitutional deprivation of plaintiffs' rights has taken place. Council action is ipso facto City action. *Monell* does not require an act to be done repeatedly to constitute "policy": It requires only a showing (which may be (1) by inference from repeated acts of individuals who are not policymakers or (2) by *any* act of policymakers who can fairly be said to act for City[14]) that the act

---

13. No opinion is expressed at this time as to whether the facts as to plaintiffs' terminations, and all the other circumstances described in the "Facts" section of this opinion, are or are not admissible evidence, to be considered on the

question of defendants' intent on plaintiffs' harassment claim.

14. One thing repeatedly forgotten (or never learned) by counsel who regularly represent municipal defendants before this Court is that *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037 uses

complained of was official and not an individual's aberrational behavior. *Reed,* 704 F.2d at 953 (citations omitted) teaches:

> The official acts of municipal policy makers are acts of the municipality for purposes of section 1983 liability.... And the municipality's liability for such acts extends to acts for which the policy-making officials themselves might enjoy absolute immunity because the acts were legislative or judicial in character.

Nothing could be plainer: City is entitled to no Section 1983 immunity in respect of plaintiffs' claimed politically-motivated terminations.

### 3. "Policymaker" Exception

City also asserts an alternative argument on the arguendo assumption that political motivations *were* involved in the Rateree, Vaughn and Gardner terminations: It says those employees were "policymakers" who could in any case be terminated for purely political reasons. As *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294 said:

> [P]arty affiliation may be an acceptable requirement for some types of government employment. Thus, if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency.

See also *Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307, 1310 (7th Cir.) (per curiam), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983) (purpose of policymaker exception "is to ensure that the first amendment's protection not interfere with the workings of democratic governments and the ability of duly elected officials to implement their policies").

Thus *Branti's* inquiry is essentially factual (445 U.S. at 518, 100 S.Ct. at 1294–95):

In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982) has formulated the test this way:

> whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.

In a certain sense, of course, any City employee could interfere with the ruling majority's mandates to some extent simply by failing to do his or her job or by bad-mouthing the administration. That is why the degree of discretion a position involves must be examined both "qualitatively" and "quantitatively" (*Gannon v. Daley,* 561 F.Supp. 1377, 1384 (N.D.Ill.1983)). Factors this Court has looked to include (*Correa v. City of Chicago,* 612 F.Supp. 884, 886–87 (N.D.Ill.1985)):

1. input into departmental policymaking;
2. role as spokesperson for the administration to some segment of the public;
3. responsibility in managing and directing "large numbers" of personnel;
4. position as liaison with other governmental agencies and units;
6. involvement with "confidential or sensitive matters"; and
7. authority to make decisions allocating departmental resources.

Defendants say there is enough record evidence to establish Rateree, Vaughn and Gardner were policymakers as a matter of

---

"policy" or "custom" in the *disjunctive.* As with state legislatures, a municipal legislative body makes policy by each single enactment. When this opinion was originally written (and before this sentence was added to this n. 14) this Court had not yet received our Court of Appeals' opin-

ion (issued two days earlier) in *Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 282–84 (7th Cir.1986). *Malak* made crystal-clear the identical point as to the scope of *Monell* expressed in the text of this opinion.

law.[15] Their R.Mem. 17 points to "factually detailed descriptions of Vaughn's and Gardner's former job positions" in Int.Ans. 5(f) and 6(f). However, *Correa*, 612 F.Supp. at 888 explains that real-world job content, rather than generalized job descriptions, controls the "policymaker" issue. And in that respect the record supporting defendants' position is sparse at best. Even the job descriptions here, while perhaps suggestive of discretion and policy input, are not very extensive: They say little about either the quantity or the quality of discretion exercised by Vaughn and Gardner. D. Johnson July 19, 1985 Aff. ¶¶ 9–10 suggest Vaughn and Gardner were very important to the Mayor and his programs, but it is not clear whether that was so because of the nature of their jobs or because they were apparently close to D. Johnson and in tune with his philosophy, causing him (not the Council majority) to rely on them. Plaintiffs counter with Berry-Beck Dec. 21, 1985 Aff. ¶¶ 7–9, which somewhat conclusorily state Vaughn and Gardner did not make policy, but only "implemented" policy.

▪ *Branti* and its progeny require a sensitive balancing of factors. Though defendants have come forward with some evidence suggesting Vaughn and Gardner might fall into the "policymaker" exception, there is just not enough here to dictate a balancing conclusion as a matter of *law*. Plaintiffs' interrogatory answers and D. Johnson's affidavit, when coupled with the favorable-inference rule to which plaintiffs are entitled, foreclose the entry of summary judgment.

Rateree's situation is different, as Pl. Mem. 13 n. 1 concedes. D. Johnson July 19, 1985 Aff. ¶ 8 describes her as his "chief administrative aide and confidential employee." It is true that D. Johnson Dec. 21, 1985 Aff. ¶ 7 further says Rateree "was

not a policy making administrator.... [S]he implemented my programs and philosophy." But the *Branti* exception does not require "policymakers" to have the absolutely final say on policy. As *Nekolny*, 653 F.2d at 1170 put it, "policymakers" need have only "meaningful input" rather than "final decisionmaking authority," and D. Johnson's statements do not negate the presumption that a "confidential aide" would have meaningful input if not final say.

Plaintiffs do not really dispute that. Instead, Pl.Mem. 16–17 argues Rateree was a policymaker only within the confines of the Mayor's office. Thus plaintiffs say *D. Johnson* could fire her for political reasons, but not *Council*. *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294–95 says the question is whether the "hiring authority" can show political affiliation is an appropriate job requirement. According to plaintiffs, because D. Johnson hired Rateree, the *Branti* formulation points to D. Johnson alone as having that right to be politically motivated in firing her.

Plaintiffs' analysis is creative, though it is backed by no apposite case citations.[16] Certainly a supervisor may fire a policymaker whose loyalty is necessary to that supervisor's work; see *Soderbeck*, 752 F.2d at 288. But where the government's principals are themselves adversaries, can the *Branti* line of authority support firing by one principal of another principal's confidential aide? Surely it would be odd if the President could fire a senator's aide (in like vein, Judge Posner said in *Soderbeck, id.*, "If Rosalynn Carter had been President Carter's secretary, President Reagan would not have had to keep her on as his secretary").

But that is not really the situation here. Any assertedly politically-motivated terminations took place at Council's behest, and

---

15. Defendants add, as to Gholson, that secretaries of policymakers are exempt from First Amendment limits on political firing as well. As Gholson was never fired (see later text) that argument need not be reached.

16. *Soderbeck v. Burnett County, Wisconsin*, 752 F.2d 285 (7th Cir.) *cert. denied,* — U.S. —, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985), the only case plaintiffs do cite, doesn't support their theory as they state it. As will be seen, though, *Soderbeck* does support the result for which they contend.

Council is the Mayor's supervisor, not his co-equal. Council, not D. Johnson, is ultimately responsible for City's policies. As such, it must have some control over subordinate policymakers who would torpedo that policy.

In those terms, however, D. Johnson's statements and Rateree's admission her status was "confidential" cannot carry the day for defendants. Almost every supervisor reposes confidence in subordinates, and the fact Rateree and D. Johnson exchanged confidences of importance to D. Johnson's view of his job is not proof those confidences were relevant to general City policies governed by Council. So long as D. Johnson had any discretionary powers, he was entitled to hire people he could trust to help him exercise that discretion—*Branti* says just that.

But this Court has not been fully informed as to the discretionary latitude the Mayor has in City's system of government, nor as to the extent of Rateree's input. Rateree has not admitted she was an all-around policymaker: She and D. Johnson say only that she helped D. Johnson do his job. Defendants have offered no more than Rateree's and D. Johnson's statements as evidence of Rateree's position. That means Rateree's "policymaker" status in *Branti* terms is a disputed material question of fact. Under *Soderbeck*, 752 F.2d at 288–89 the resolution of that factual question is for the jury.[17]

### 4. *"Prima Facie Case"*

Defendants' remaining attack on Count I argues plaintiffs have not made out a prima facie case that any of defendants' actions were politically motivated. But even a brief review in terms of the operative principles on summary judgment motions

---

17. It should be added defendants have made no claim Brown was a policymaker. See Def.Mem. 17.

18. Conclusory statements pose the same problem in affidavits as they would from the stand (see Rule 56(e)), but the summary nature of the D. Johnson statements referred to in the text is not so troublesome as to require that they be ignored entirely on the current motion.

demonstrates defendants' argument is a red herring.

Plaintiffs' ultimate success on the merits depends on their proving their political activities were a "motivating factor" of defendants' actions against them (*Nekolny*, 653 F.2d at 1167). In response to a Rule 56 motion, though, they need only "set forth specific facts showing that there is a genuine issue for trial" on that subject (*Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983))

In fact plaintiffs have tendered some evidence (albeit not much) of political motivation. D. Johnson July 19, 1985 Aff. ¶ 3 says only City staff loyal to him have been cut from the budget, and *id.* ¶ 5 says Rockett, Piekarski and Gilmore have "consistently voted as a block [sic]" on budget matters. As Mayor and as a member of Council, D. Johnson is competent to testify to those facts.[18] Another arguable piece for plaintiffs' claimed mosaic is Rateree's successful run against Rockett for delegate to the 1984 Democratic National Convention along Jackson/Mondale lines. That suggests political differences between Rockett and Rateree directly, not just derivatively through D. Johnson. Further, the hiring freeze accompanying the 1985–86 budget cuts (see Pl.Ex.6) has been lifted—so D. Johnson Dec. 21, 1985 Aff. ¶ 6 says—only for supporters of Rockett, Piekarski and Gilmore.

Thus plaintiffs' evidence isn't much, but defendants do little more than deny it. They offer no evidence in opposition to plaintiffs' assertion but simply say (Mem. 4) there is no "majority bloc." Though defendants dispute the competence and admissibility of much of plaintiffs' evidence,[19] enough competent and admissible evidence

---

19. This Court has not considered plaintiffs' multiple exhibits purporting to be extracts from City's Council meetings, nor does it give any weight to hearsay statements of Moss and Bloomberg. All that is inadmissible evidence and cannot be considered under Rule 56(e).

exists to state their claim. See *Backes v. Valspar Corp.*, 783 F.2d 77, 80 (7th Cir. 1986) (reversing summary judgment because record, however "weak," "provides some grounding" for plaintiffs' theory—hence case must to go jury).

Defendants do say Gilmore supported Jesse Jackson (see Gilmore Aff. ¶ 5), but whether or not that is so is not "outcome-determinative" (*Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984)). On the local level Gilmore may still have opposed D. Johnson, Berry-Beck and their followers. Gilmore's affidavit notably does *not* state he did not form a "block" with Rockett and Piekarski—and certainly he would know that.

■ Motivation questions are always slippery. One side says "was," the other says "wasn't." At this point the record is in a primitive state. Discovery has been stayed pending defendants' motion (see Nov. 7, 1985 Transcript of Proceedings). Nothing defendants have produced negates the factual dispute plaintiffs have raised as to motivation. Summary judgment is inappropriate.

Finally (and similarly) defendants have done no more than deny plaintiffs' allegations of harassment. Plaintiffs have offered (Int.Ans. 16) various instances of harassment as to Rateree, Vaughn and Gardner. To the extent Gholson's claim consists of asserted harassment by her superior, John Henderson, that activity might be construed as nothing more than a reaction to poor job performance, as plaintiffs' own submissions suggest (see Pl.Exs. 71, 72). But that too is a disputed motivation question.

Further, though she was never fired, Gholson's 1984 job was eliminated from the 1984–85 budget. That forced her to transfer to another position. Def.Mem. 4 and R.Mem. 11 simply say "It ain't so." That doesn't suffice to meet a movant's Rule 56 burden. None of defendants' factually-based arguments can get them summary judgment.[20]

## Count II

■ As to Count II, defendants first claim W. Johnson is entitled to the benefit of qualified good-faith immunity under *Wood*, 420 U.S. at 322, 95 S.Ct. at 1001, which says a public official is immune from Section 1983 damages liability unless:

> he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [person] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury....

As to W. Johnson's knowledge or malice, plaintiffs appear to rely on a res ipsa loquitur approach: W. Johnson did not send the checks as soon as he might have, and the letter proposing settlement went out over his signature. Beyond that, plaintiffs merely point out W. Johnson's affidavit and deposition testimony are self-serving and contain some inconsistencies.[21]

But nothing contradicts his assertion (Aff. ¶ 17) that, in his August 6 labeling of the vacation-pay checks as in "settlement of a dispute between the City and the employee," he meant only to refer to plaintiffs' August 5 letters threatening suit for that selfsame vacation pay. It is only by ignoring or disputing that statement—by seeking to attack W. Johnson's "settlement" condition to the much larger subject of *this* litigation[22]—that plaintiffs can say he (Complt.Ct. II ¶ 16):

**20.** No harassment claim as to Brown is made, as he was simply terminated in July 1984.

**21.** For example W. Johnson Aff. ¶ 17 says he did not know this lawsuit was pending when he sent plaintiffs their checks. Plaintiffs say that must be a lie because they served him, in his capacity as City Clerk, with the original complaint. In fact the summons acknowledgement (Pl.Ex. 62)

is merely addressed to "City Clerk" and shows no acknowledgement of receipt. Certainly that is not a refutation of W. Johnson's sworn statement.

**22.** It will be recalled W. Johnson has testified he was then unaware of this lawsuit (see n. 21), and no basis except speculation has been suggested for disbelieving that testimony. It

intentionally and deliberately, with malice, attempted to interfere with plaintiffs' due process rights to litigate their claims, and with access to the court system.

Contrast *Silver v. Cormier*, 529 F.2d 161, 163 (10th Cir.1976) (held actionable for government officer to tell plaintiffs that officer would not pay money owed to plaintiffs if they instituted legal proceedings on an independent matter).

This Court cannot accept the invitation to gloss over (or reject) W. Johnson's uncontroverted and objectively plausible statement of his motivation. No basis exists for liability against W. Johnson.

■ Next defendants renew their earlier effort to claim City is immune under *Monell*, again because plaintiffs have not established a "custom or policy" of withholding checks to terminated employees. As before, defendants' argument distorts *Monell*. Because this Court and its colleagues so frequently find the same empty contention repeated by municipal lawyers who should know better, the answer will be repeated: "Policy" is an act of a policymaker "whose edicts or acts may fairly be said to represent official policy." Only in cases where the source of an alleged policy is uncertain must a plaintiff inferentially prove the existence of a policy by proving "custom."

Here W. Johnson Dep. 24–38 establishes the real moving force behind the check transactions was Piekarski, who as Commissioner of Accounts and Finance had final word on disbursements. Piekarski set official policy for his department. Only Council as a whole was higher than he in his domain. That is not to say City is responsible for Piekarski's acts on a theory of respondeat superior: *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036 teaches otherwise. But "official policy" need not be restricted to the acts of a legislative body itself. As *Rookard v. Health and Hospitals Corp.*, 710 F.2d 41, 45 (2d Cir.1983) (footnote omitted) said:

> Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.

Piekarski is not a defendant on Count II,[23] but it is undisputed the decision to withhold the checks was his. That makes it City's. Defendants have presented nothing to dispute W. Johnson's narrative. Consequently City is not immune from Plaintiffs' Count II claim.

■ Finally defendants argue Count II is moot because plaintiffs have cashed the checks and are no longer being deterred (if they ever were) from exercising their constitutional right to litigate in this federal court. That contention certainly demonstrates the claimed harm no longer persists, and it may suggest the harm was de minimis while it lasted, but it does not moot the issue. Plaintiffs ask not for injunctive relief, but for compensatory and punitive damages (and attorneys' fees, of course).

---

should also be noted it is not at all unusual for someone, in sending funds in payment of an amount that had previously been the subject of controversy, to refer to "settlement" even though the payment represents 100 cents on the dollar.

**23.** Apparently plaintiffs offered on October 18, 1985 to substitute Piekarski for W. Johnson on Count II, but defendants refused (see Pl.Mem. 23). Plaintiffs claim that was an abuse, for *Murray v. City of Chicago*, 634 F.2d 365, 366 (7th Cir.1980), *cert. dismissed*, 456 U.S. 604, 102 S.Ct. 2226, 72 L.Ed.2d 366 (1981) (footnote omitted) says:

> The defendants should not be permitted to "get off the hook" by merely pointing the finger at each other. Someone is surely at

fault for failing to establish or execute appropriate procedures for preventing such serious malfunctionings of the administration of justice. Plaintiff should be entitled to discovery in order to determine who is the true culprit responsible for the wrong done her.

*Murray* is inapposite here, for it involved no question of substituting parties, but rather a dispute between two named defendants as to which was responsible for the harm. Piekarski is not a Count II defendant at all. In any case, plaintiffs' argument is without merit for the simple reason it was not within defendants' power to control the amendment process (either by agreeing or disagreeing). Plaintiffs' request to amend should properly be made in the form of a Rule 15 motion to this Court.

Punitive damages were sought only against W. Johnson,[24] who is now held immune from suit. This is not the time to speculate about compensatory damages.[25] It suffices to say Count II's prayer for such damages against City survives. See *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 7–9, 98 S.Ct. 1554, 1559–60, 56 L.Ed.2d 30 (1978) (plaintiffs' receipt of $35 overbilled by city utility did not moot their claim for damages due to the overbilling).

### Sanctions

■ Defendants' motion for sanctions takes pot-shots at the Complaint, essentially rearguing the merits of their summary judgment motion. Rule 11 now provides an objective standard: Sanctions are to be imposed if "a competent attorney," after "reasonable inquiry," could not reasonably believe a pleading is "well grounded in fact" and "warranted by existing law or a good faith argument for [its] extension, modification or reversal." *Indianapolis Colts v. Mayor and City Council of Baltimore*, 775 F.2d 177, 181 (7th Cir.1985), quoting (with approval) *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985). Here most of plaintiffs' claims have withstood defendants' attacks, and those on which they have lost were not matters so well settled that reasonable legal minds might not differ. Rule 11 sanctions are wholly inappropriate here:[26] Plaintiffs' claims were not "destined to fail" (*Eastway*, 762 F.2d at 254).[27]

For much the same reasons, defendants' 28 U.S.C. § 1927 claim for sanctions is denied—really a fortiori. There is no showing whatever of "unreasonable" or "vexatious" proceedings.

### Conclusions

In summary, this Court finds:

1. Rockett, Piekarski and Gilmore are entitled to dismissal from plaintiffs' Count I wrongful-termination claims on absolute legislative immunity grounds.

2. In all other respects, defendants' summary judgment motion addressed to Count I is denied.

3. W. Johnson is entitled to dismissal from the Count II claims on qualified good-faith immunity grounds.

4. In all other respects, defendants' summary judgment motion addressed to Count II is denied.

5. Defendants' motion for sanctions is denied in its entirety.

This action is set for a status report at 9:15 a.m. on March 31, 1986 to review further discovery needs and preparation for trial. In the meantime, discovery should of course resume.

---

**24.** Cities are not liable for punitive damages under Section 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

**25.** Defendants' R.Mem. 5–6 says "Even a first year law student knows" the proffered releases would not have stood up, so plaintiffs could hardly have been "chilled." But plaintiffs were not law students. What a non-lawyer would think of W. Johnson's letters is a matter defendants do not address. And to the extent plaintiffs may have had to consult lawyers to determine the validity of the proposed releases, it would remain for future decision whether the cost of such legal services is a recoverable element of damages.

**26.** In light of this opinion's resolution of most of defendants' substantive arguments, their Rule 11 motion may well call into play the well-known legal proposition that people who live in glass houses shouldn't throw stones.

**27.** Defendants make one charge worth some comment: Complaint Count I ¶ 26 says Gholson was "discharged" as Vaughn's secretary by defendants, and Pl.Mem. 16 says she was "terminated." Defendants correctly point out Gholson still works for City, so she was never discharged or terminated at all. But that seems to represent a semantic, not a factual, dispute. Complaint Count I ¶ 41 admits Gholson is still employed by City. She says only that her job with Vaughn was terminated and so she was transferred to another position where she was subject to harassment—all because of her political affiliations. No distortion of facts is involved.