**Bonnie RATEREE, Ken Vaughn, William Gardner, Leander Brown, Plaintiffs-Appellants,**

**v.**

**Damon ROCKETT, Frank Piekarski, Otis Gilmore, Defendants-Appellees.**

No. 87–2114.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1988.

Decided July 18, 1988.

Alan M. Freedman, Freedman & Bornstein, P.C., Chicago, Ill., for plaintiffs-appellants.

Nancy G. Lischer, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and COFFEY, and MANION, Circuit Judges.

BAUER, Chief Judge.

Bonnie Rateree, Kenneth Vaughn, William Gardner, Leander Brown, and Renee Gholson sued the City of Harvey, Illinois (Harvey) and three City Commissioners—Damon Rockett, Frank Piekarski, and Otis Gilmore—under 42 U.S.C. § 1983, claiming violations of their first and fourteenth amendment rights. The plaintiffs, city employees, claim they were harassed because of their political views and that all plaintiffs except Gholson eventually were fired for purely political reasons. The district court dismissed the plaintiffs' complaint, holding that the defendants' actions were protected by absolute legislative immunity. *Rateree v. Rockett*, 630 F.Supp. 763 (N.D. Ill.1986). We affirm.[1]

## I.

The district court's findings of fact tell the following story:

In May, 1983, the voters of Harvey elected David Johnson as the City's first black mayor. All the plaintiffs supported and campaigned for Johnson and his ticketmate, Ernestine Berry–Beck, whose run for City Commissioner also was successful. Gilmore also ran for City Commissioner on Johnson's ticket and was elected. During the same election, all plaintiffs campaigned against Rockett and Piekarski and supported their opponents for City Commissioner slots. Rockett and Piekarski won.

Harvey operates under the commission form of government. Its legislative body is a city council consisting of four commissioners and a mayor, with each having one vote. The commissioners and the mayor are elected at large.

Soon after his election, Johnson appointed Rateree as his "Special Assistant." Rateree became Johnson's chief administrative aid and confidential employee. Rateree's duties included assisting the Mayor in managing the Department of Public Affairs and the Office of Mayor, assisting in the development of departmental goals, objectives, and supervising of staff, assisting the Mayor in his public relations activities, and coordinating human services for Harvey citizens in crises.

In September, 1983, Johnson appointed Vaughn as Coordinator of Economic Development. Vaughn's duties included initiating programs and services to encourage development of new businesses, the expansion of existing businesses, and coordinating efforts with other government and private agencies to insure maximum participation in state, county, and federal programs geared toward Harvey's economic development needs. Also in September, 1983, Johnson appointed Gardner as Coordinator of Housing. Gardner's duties included responsibility for management of departmental projects as assigned by the Director of Planning and Development, and the exercise of discretion in meeting project goals and schedules. Neither Vaughn nor Gardner reported directly to Johnson. Instead each reported to the City Planner.

In late December, 1983, Johnson hired Brown as Harvey's Employment and Training Coordinator. Nothing in the record describes Brown's duties or responsibilities. Gholson was hired in February, 1984 (though it is unclear from the record who hired her) as Vaughn's secretary. She was also the secretary to the Coordinator of Economic Development and was responsible for typing, filing, and answering phone calls.

All the plaintiffs' jobs (with the possible exception of Brown's) were positions created by Harvey's 1983–84 budget. These salaries were adjusted during fiscal 1983–84. Then, on July 23, 1984, the City Coun-

---

**1.** Count II of the plaintiffs' amended complaint alleged that the City Clerk, Walter Johnson, wrongfully withheld the disbursement of vacation pay checks to the plaintiffs to prevent them from bringing this lawsuit. The district court's disposition of this count is not before us on appeal.

cil passed Harvey's 1984–85 budget ordinance, which eliminated the appropriations for the jobs held by all plaintiffs. Rockett, Piekarski, and Gilmore voted for the 1984–85 ordinance, while Johnson and Berry–Beck voted against it.

Rateree, Vaughn, Gardner, and Brown were removed from Harvey's payroll in July, 1984, while Gholson was transferred to a secretarial position under Berry–Beck. In December, 1984, Rateree, Vaughn, and Gardner were rehired—Rateree as Administrative Manager to the Mayor, Vaughn as Project Manager of Economic Development, and Gardner as Project Manager of Housing. Funding for Rateree's job came from a line item in Johnson's budget; Vaughn's and Gardner's jobs were created by Berry–Beck and funded from her budget. Brown was never rehired.

Plaintiffs filed this lawsuit on May 15, 1985. At that time, they claimed that Rockett, Piekarski, and Gilmore "harrassed" them and that they were under imminent threat of discharge "because of their political affiliations." Nothing happened to them, however, until the City Council passed the 1985–86 budget ordinance on July 11, 1985. (Rockett, Piekarski, and Gilmore voting in favor, Johnson and Berry–Beck against.) That ordinance contained further cuts affecting plaintiffs. It deleted "Secretary and Other" as a line item from Johnson's budget (eliminating funding for Rateree's job) and withdrew funding for Vaughn's and Gardner's jobs. In other words, the 1985–86 budget once again eliminated the plaintiffs' job positions. As of July 22, 1985, Rateree, Vaughn, and Gardner thus joined Brown as former employees of Harvey.

Plaintiffs allege that they were harassed and ultimately "terminated" by defendants because of their political support for Johnson and Berry–Beck. They claim Rockett, Piekarski, and Gilmore—the so-called Council "majority bloc"—opposed Johnson and

plaintiffs because the former group supported Walter Mondale in the 1984 presidential race, while Johnson, Berry–Beck, and the plaintiffs supported Jesse Jackson's candidacy. (Rateree was elected as a "Jesse Jackson/Harold Washington favorite son" delegate to the 1984 Democratic Convention, while Rockett, who ran as a Mondale delegate, was not elected.)

Plaintiffs contend that their ultimate separation from City employment had nothing to do with budgetary demands, for their aggregate salaries amounted to only $100,000 or so as against Harvey's deficit (even after the cuts) of over $1.2 million. Both Johnson and Rateree say they were told by Harvey's corporation counsel, Barry Moss and Steven Bloomberg, that the adverse budget action was "politically motivated" or "for political reasons rather than budget constraints." Thus, Rateree, Vaughn, and Gardner claim that they were harassed "solely" because of their support for Johnson and for Jesse Jackson. Gholson, who is still on the City payroll, claims she was harassed for her loyalty to Johnson.

## II.

The district court held that the defendants' actions were protected under the doctrine of absolute legislative immunity. *Rateree*, 630 F.Supp. 763. In a thorough and well-reasoned opinion, the district court found that the actions of the defendants were legislative, not administrative, and were therefore protected, regardless of the defendants' motives. *Id.* at 771–72.

Absolute legislative immunity from section 1983 actions is a judicially created doctrine. Indeed, the plain language of section 1983 appears to preclude any notion of immunity. 42 U.S.C. § 1983; *Tower v. Glover*, 467 U.S. 914, 920, 104 S.Ct. 2820, 2824, 81 L.Ed.2d 758 (1984). Section 1983 subjects to liability "every person" who under color of state law or custom deprives a citizen of her constitutional rights.[2] As

---

2. § 1983. *Civil action for deprivation of rights*
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected,

any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an ac-

Justice Douglas has noted, "[t]o most, 'every person' would mean *every person*, not every person *except* judges," *Pierson v. Ray*, 386 U.S. 547, 559, 87 S.Ct. 1213, 1220, 18 L.Ed.2d 288 (1967) (Douglas, J., dissenting) (emphasis in original), or legislators. Nevertheless, the Supreme Court has long held that the language of section 1983 should not be read to suggest that Congress meant to abrogate well-established common law immunity doctrines. *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951); *Pierson*, 386 U.S. at 554, 87 S.Ct. at 1218. As a result, the Supreme Court has often resorted to painstaking analyses of common law immunity doctrines to determine the scope of section 1983 immunities; if certain public officials were immune from civil liability prior to the 1871 enactment of section 1983, their immunities survived. *See e.g., Pulliam v. Allen*, 466 U.S. 522, 528–36, 104 S.Ct. 1970, 1973–78, 80 L.Ed.2d 565 (1984).

Just recently, however, the Supreme Court, in a judicial immunity case, retreated slightly from this common law approach, resting its reliance on absolute immunity instead of on the policy considerations supporting the doctrine of immunity. *Forrester v. White*, —— U.S. ——, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). In *Forrester*, the Court stated:

Suits for monetary damages are meant to compensate the victims of wrongful actions and to discourage conduct that may result in liability. Special problems arise, however, when government officials are exposed to liability for damages. To the extent that the threat of liability encourages these officials to carry out their duties in a lawful and appropriate manner, and to pay their victims when they do not, it accomplishes exactly what it should. By its nature, however, the threat of liability can create perverse incentives that operate to *inhibit* officials in the proper performance of their duties. In many contexts, government officials are expected to make decisions that are impartial or imaginative, and that above

all are informed by considerations other than the personal interests of the decisionmaker. Because government officials are engaged by definition in governing, their decisions will often have adverse effects on other persons. When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct. In this way, exposing government officials to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it.

*Id.* at 542 (emphasis in original).

 Since *Tenney*, it is clear that state legislators are absolutely immune from lawsuits when acting in their legislative capacities. 341 U.S. 367, 71 S.Ct. 783. The Supreme Court explained that legislators "are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good." *Id.* at 377, 71 S.Ct. at 788. In *Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), the Supreme Court extended the absolute immunity created in *Tenney* to regional legislators acting in a legislative capacity, *id.* at 405, 99 S.Ct. at 1179, despite the fact that these regional legislators were unelected and therefore unaccountable to the public for their legislative acts, *id.* at 407, 99 S.Ct. at 1180 (Marshall, J., dissenting). The Supreme Court expressly reserved the question whether absolute immunity should also be extended to individuals performing legislative functions at the local level, *id.* at 404, n. 26, 99 S.Ct. at 1178–79, n. 26, the issue before us now.

This question, however, is not one of first impression. We are bound by our earlier decision in *Reed v. Village of Shorewood*, 704 F.2d 943, 952–53 (7th Cir.1983), which held that local legislators are absolutely immune for their legislative acts. In

tion at law, suit in equity, or other proper proceeding for redress....

*Reed,* we followed the lead of several other circuits in extending absolute legislative immunity to local legislators, *id.* at 952, even though we recognized that "the safeguards against arbitrary action are fewer at the local than at the state or federal level." *Id.* at 952–53. This extension of absolute legislative immunity to local legislators recognizes that there is no material distinction between the need to insulate legislators at the national level to protect the public good, *Tenney,* 341 U.S. at 377, 71 S.Ct. at 788–89, and the same need at the local level. *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 612 (8th Cir. 1980).

 Absolute immunity, however, only applies to those legislators acting in their legislative capacity. Administrative or executive acts of legislators are not protected. *Tenney,* 341 U.S. at 379, 71 S.Ct. at 789–90. This "functional" approach focuses on the nature of the duties with which a particular government official "has been lawfully entrusted, [and evaluates] the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester,* 108 S.Ct. at 542. The government official seeking immunity, therefore, has the burden of showing that an exemption from personal liability is justified "by overriding considerations of public policy," *id.,* or by a tradition of common law practice existing at the time of the enactment of section 1983. *Pulliam,* 466 U.S. at 529, 104 S.Ct. at 1974; Tower, 467 U.S. at 920, 104 S.Ct. at 2824–25.

 The plaintiffs' main contention on appeal is that the defendants' actions are not protected because they were administrative. In this case, the governmental action attacked by the plaintiffs concerns a budgetary decision by the Commissioners of Harvey to eliminate certain jobs. The district court discussed in detail whether this action was legislative or administrative. It concluded that

> [b]udgetmaking is a quintessential legislative function, reflecting the legislators' ordering of policy priorities in the face of limited financial resources. When bud-

gets are cut materially in an industry as labor-intensive as that of local government, some people will almost surely lose their jobs. But that does not convert a budget cut into an "administrative" employment decision....

630 F.Supp. at 771. We agree with the district court, especially where, as here, the plaintiffs' positions were eliminated altogether and no one was hired to replace them. *Id.* Plaintiffs submit that because their jobs were terminated by defendants, the defendants' conduct was necessarily administrative since it involved employment decisions. We agree with plaintiffs to the extent that employment decisions generally are administrative, regardless whether made by a judge or a legislature. *See, e.g., Forrester,* 108 U.S. 538 (no judicial immunity for firing of probation officer by judge because of sex); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (no legislative immunity for member of Congress for firing of staff employee because of sex). Plaintiffs' position, however, would turn every budget decision into an administrative one. This backdoor approach is unacceptable.

Almost all budget decisions have an effect on employment by either creating or eliminating positions or by raising or lowering salaries. This reality, however, does not transform a uniquely legislative function into an administrative one. Unlike the employment decisions made in *Forrester* and *Davis,* the defendants here did not fire the plaintiffs, but rather eliminated their jobs from the city budget. Plaintiffs' position would hold a judge liable for a decision in an employment case resulting in the firing of an employee, despite the obvious judicial nature of the act. Employment decisions are not administrative when accomplished through traditional legislative functions. They are not "employment decisions" at all but instead, legislative, public policy choices that necessarily impact on the employment policies of the governing body. The political decision making inevitably involved in exercising budgetary restraint strikes at the heart of the legisla-

tive process and is protected legislative conduct.

Plaintiffs also argue that the defendants are not immune because the City of Harvey has a commission form of government in which the individual commissioners act in executive as well as legislative capacities. Ill.Rev.Stat. ch. 24 ¶ 4–5–2 (1985). *See also Derrickson v. City of Danville,* 845 F.2d 715 (7th Cir.1988). The plaintiffs would have the court abolish a functional approach in favor of a broad, per se rule which eliminates all immunity for the commission form of government. We decline this invitation. To the extent that the commissioners act in their legislative capacity, they are protected; when they act administratively, they are not. "We look to the function the individual performs rather than his location within a particular branch of government." *Aitchison v. Raffiani,* 708 F.2d 96, 99 (3d Cir.1983). For example, when the Vice President of the United States votes in the Senate to break a tie, U.S. Const. art. I § III cl. 4, he acts legislatively, not executively. Similarly, the President acts legislatively when he approves or vetoes bills passed by Congress. *See, e.g., La Abra Silver Mining Co. v. United States,* 175 U.S. 423, 453, 20 S.Ct. 168, 44 L.Ed. 223 (1899); *Edwards v. United States,* 286 U.S. 482, 490, 52 S.Ct. 627, 630, 76 L.Ed. 1239 (1932). When a judge makes personnel decisions concerning his court, he acts administratively, not judicially. *Forrester,* 108 S.Ct. at 545. Although this line drawing is often difficult, it preserves the balance between inhibiting public officials from exercising their essential duties and protecting victims of wrongs committed by public officials.

Admittedly, a particular legislator may vote for legislation for seemingly improper reasons; nevertheless, the rule of absolute immunity shields this conduct. Undoubtedly, this rule may create unhappy results at times, particularly in local legislative bodies where garnering a majority of votes may be relatively easy. One recourse in dealing with legislators who hide behind

their shield of immunity and vote "improperly" is, of course, a resort to the ballot box.

In short, the doctrine of absolute immunity does limit the ability of those wronged by certain legislative acts to recover from individual legislators who may have acted illegally.[3] Yet, this is long-established law and we must follow it. This rule reflects the need to ensure and protect a vigorous, often contentious, democracy within this nation's legislative bodies. The doctrine of immunity embodies the long-held belief that this country is better served by limiting recovery to injured parties rather than threatening the legislative process by placing legislators in fear of lawsuits from exercising their legislative duties. For these reasons, we

AFFIRM.

---

**3.** Nevertheless, it is interesting to note that the plaintiffs in this case did succeed in a lawsuit against the City of Harvey and recovered dam-ages. This, at least, demonstrates the availability of other relief.