CHICAGO MIRACLE TEMPLE CHURCH, INC.; Pastor William P. Anderson; Mr. Larry Wilson; Mr. James M. Briggs; Mr. Addison Bell; Ms. Lola Parker; Mr. Robert Scoggins; and Ms. Cheryl E. Anderson, Plaintiffs,

v.

Reverend J. Michael FOX; Walter Kruger; Duane Fritz; the Lansing Bible Church; the Village of Lansing, Illinois; Robert West, as Mayor of the Village of Lansing, Illinois and in his individual capacity; James McCollum, Patti Leach, Thomas Eisha, Thomas Cremonesi, Marvin Lyzenga and John Marczewski, in their official capacity as Trustees of the Village of Lansing, Illinois and in their individual capacities, Defendants.

No. 94 C 413.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 26, 1995.

---

Joanne Kinoy, Jeffrey Lynn Taren, Kinoy, Taren, Geraghty & Potter, Louis E. Bellande, Mauck, Bellande, Baker & O'Connell, DaVina L. Farmer, Thomas E. Vaughn & Associates, Chicago, IL, for Chicago Miracle Temple Church, Inc., Ira Le, William P. Anderson, Pastor, Larry Wilson, James M. Briggs, Addison Bell, Lola Parker, Robert Scroggins, Cheryl E. Anderson.

Ronald N. Primack, Law Office of Ronald N. Primack, Lansing, IL, C. Joseph Yast, Law Office of C. Joseph Yast, Northfield, IL, for J. Michael Fox, Reverend, Duane Fritz.

Ronald N. Primack, Law Office of Ronald N. Primack, Lansing, IL, C. Joseph Yast, Law Office of C. Joseph Yast, Northfield, IL, Danny Lane Worker, John Michael Power, Worker & Power, Chicago, IL, for Walter Kruger.

John Joseph Bullaro, Jr., Robert P. Vogt, William G. Stone, Bullaro, Carton & Stone, Chicago, IL, for Lansing Bible Church.

Ronald S. Cope, Thomas George DiCianni, Mark Allen Balkin, Ancel, Glink, Diamond, Cope & Bush, Chicago, IL, for Village of

Lansing, Illinois, Robert West, as Mayor of the Village of Lansing, Illinois in his individual capacity, James McCollum, Patti Leach, Thomas Eisha, Thomas Cremonesi, Marvin Lyzenga, John Marczewski, in their official capacity as Trustees of the Village of Lansing, Illinois and in their individual capacities.

## MEMORANDUM OPINION AND ORDER

CASTILLO, Judge.

The Chicago Miracle Temple Church ("the church"), the church's pastor, and the church's board of directors (collectively "plaintiffs") sue the Village of Lansing ("the village"), the village's mayor, and the village's board of trustees (collectively "defendants") under 42 U.S.C. §§ 1983, 1985(3) and 1986 (Counts III, IV and V, respectively).[1] The mayor and board members are sued both in their official and individual capacities. This suit arises out of the church's thwarted attempt to purchase real property in the village—the site of the Lansing Bible Church ("the property"). All of the Chicago Miracle Temple Church members are African-American. The plaintiffs allege that the defendants deprived them (and conspired—amongst themselves and with the private defendants—to deprive them) of the equal protection of the laws by acting to prevent the church from purchasing the property because of the racial composition of the church's membership. The plaintiffs further allege that the defendants had knowledge of such a conspiracy and neglected to prevent its commission despite their power to do so. The

plaintiffs seek injunctive relief as well as $10 million in actual and punitive damages. The defendants' motion for summary judgment on counts III, IV, and V of the complaint is presently before the court.

## BACKGROUND

The following undisputed facts are gleaned from the parties' respective Local General Rule 12 statements of material facts and accompanying exhibits.[2] These facts are deemed without substantial controversy and shall be considered as established pursuant to Fed.R.Civ.P. 56(d).

From June 1992 through August 1993, the Lansing Bible Church listed for sale property located at 18123 Burnham Avenue, which includes a building formerly used by the Lansing Bible Church. Defs.' Facts ¶ 5. The property was initially listed for $290,000; however, in May 1993, the Lansing Bible Church changed real estate agents and lowered the asking price to $260,000. *Id.*

In the spring of 1993, the village held an election for various members of the board of trustees and for the village president. Robert West ("West"), the successful candidate for president, and James McCollum ("McCollum"), an unsuccessful candidate for president but a sitting trustee, both publicly commented during their campaigns on the need to provide programs for the village's youth and the possibility of purchasing a building for a youth center. *Id.* ¶ 6.

At a regular meeting of the village board, on June 8, 1993, a member of the audience

---

1. The plaintiffs also sued the Lansing Bible Church, Reverend J. Michael Fox, Walter Kruger, and Duane Fritz (collectively "the private defendants") under 42 U.S.C. § 1981 and 1985(3) (counts I and II respectively). These defendants have settled with the plaintiffs and therefore these counts are no longer before the court.

2. Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." Defendants' Statement of Material Facts submitted in connection with their motion for

summary judgment shall be cited as "Defs.' Facts ¶ __." Similarly, Local Rule 12(N)(3)(a) requires the nonmoving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Plaintiffs' Local Rule 12(N)(3)(a) response to defendants' facts, which the plaintiffs have entitled "Rule 12N Statement of Additional Material Facts," shall be cited as "Pls.' Facts ¶ __." All properly supported material facts set forth in either party's statement are deemed admitted unless controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994).

suggested that the village should consider the property at 18123 Burnham Avenue, and a vacant restaurant building, which was formerly occupied by "Pipes and Pizza," as possible locations for a village youth center. *Id.* ¶ 7.

In July, 1993, plaintiff Cheryl Anderson, the wife of William Anderson, the church pastor, became aware that the property at 18123 Burnham Avenue was for sale. *Id.* ¶ 8. On July 18, 1993, Cheryl and William Anderson inspected the property. On August 1, 1993, the board of directors of the church voted to make an offer to purchase the property. *Id.* ¶ 9. On or about August 8, 1993, the church tendered a written communication, which it termed an offer, to purchase the property for $230,000.[3]

On or about August 13, 1993, Duane Fritz ("Fritz"), an Elder of the Lansing Bible Church, met with West at the Lansing Village Hall. *Id.* ¶ 11. Fritz did not have an appointment to meet with West. Fritz stated that he was aware that the Village might be interested in acquiring the Lansing Bible Church property for a youth center and he then informed West that the property was listed for sale at a price of $260,000 and that a bid of $230,000 had been received from a black church located in the City of Chicago. *Id.* ¶ 11; Pls.' Facts ¶ 10; Fritz Aff. ¶ 4; West Dep. at 100, 103, 104, 106, 110. Fritz attests that he did not discuss with West whether the Village should or would offer to purchase the property to prevent the church from purchasing the property. Fritz Aff. ¶ 5. Nor did West recall any such conversation. West Dep. at 100–09.

On or about August 16, 1993, West contacted Kenneth Johnson ("Johnson"), a real estate sales agent, who worked in the same office as the listing agent for the Lansing Bible Church property. Defs.' Facts ¶ 13;

West Dep. at 121–126. West made an appointment with Johnson to view the property later that day. West notified other village trustees and asked if they could view the property. Defs.' Facts ¶ 13. Johnson and West viewed the property that day, along with Kenneth Stratka ("Stratka"), the village building commissioner and president of the Lansing Park District, Jim Garrison ("Garrison"), the village code enforcement officer, and Norman Abbott ("Abbott"), chairman of the village plan commission. *Id.* ¶ 14.

■ After viewing the property, West contacted Jeffrey Besse ("Besse"), an elder at the Lansing Bible Church, and indicated that the village was interested in purchasing the property for a youth center. *Id.* ¶ 15. West indicated that the village would probably offer the asking price of $260,000 for the property. *Id.*[4] Besse attests that although West indicated to him that he (West) was aware that another offer had been made, West did not indicate that he knew that the other offeror was a church with an African American congregation. Besse Aff. ¶ 4. Besse further attests that at no time prior to the village's offer to purchase the property did he discuss with West the race of the other offeror. *Id.* ¶ 5. Nor did Besse discuss with West whether the Village should or would offer to purchase the property to prevent the Chicago Miracle Temple Church or any other party from purchasing the property because of their race. *Id.* ¶ 6.

The village board voted to make an offer to purchase the property for $260,000 at the August 17, 1993 village board meeting. *Id.* ¶ 16. The offer was contingent on the property having a certified appraisal that supported a value of $260,000, and on an opinion from bond counsel that tax increment financing bonds could be used to finance the purchase. *Id.* ¶ 16. On August 19 or 20, 1993, the village attorney contacted Johnson and

---

3. The church's offer included a provision that "[w]ithin 5 days of acceptance, buyer's full Board of Directors' affirmative vote is required." Defs.' Facts, Ex. B. Defendants dispute that this communication constituted an offer, arguing that, because of this condition, the communication was an invitation for an offer. Defs.' Mem. Supp.Summ.J. at 7.

4. The plaintiffs purport to dispute Defs.' Facts ¶ 15, stating "Plaintiffs do not accept as facts the assertions of ¶¶ 12, 13, 15 and 20–28 of Defendants' Rule 12M Statement of Material Facts." Pls.' Facts ¶ 17. However, plaintiffs do not indicate the nature of their factual dispute nor do they reference parts of the record to support a factual dispute. Accordingly, pursuant to Local Rule 12, defendants' properly supported factual assertion is deemed admitted.

informed him that the village's offer had been prepared. Johnson delivered the offer to the Lansing Bible Church the following day. *Id.* ¶ 17. The church then raised its offer from $230,000 to $260,000 to match the village's offer. *Id.* ¶ 18. On August 29, 1993, the members of the Lansing Bible Church voted to accept the village's offer. *Id.* ¶ 19.

It is undisputed that none of the plaintiffs have had any contact with any official, employee or agent of the village. *Id.* ¶ 29. The village contends that West's only conversations with Fritz were at the meeting on August 13, 1993 and a single telephone call by Fritz to West sometime between August 22 and August 29, 1993, in which Fritz informed West that the Lansing Bible Church would vote on the village's pending offer on August 29, 1993. *Id.* ¶ 26. The village also contends that at no time did West and Fritz discuss whether the village should or would offer to purchase the property to prevent the church from moving to Lansing. *Id.* ¶ 12. The village further contends that at no time prior to August 29, 1993 did West and Besse discuss the race of the other offeror or agree that the village should or would offer to purchase the property to prevent the church from purchasing the property because of the race of its members. *Id.* ¶ 27. The church disputes these facts, but does not reference parts of the record to support a factual dispute.[5] Pls.' Facts ¶ 17. Because the plaintiffs have failed to satisfy the requirements of Local Rule 12(N)(3)(a), requiring the non-moving party to provide specific references to supporting materials, these facts set forth in the defendants' statement, and properly supported, are deemed admitted. Local Rule 12(M) and 12(N)(3)(b); *see also Bell v. Tapy,* 896 F.2d 1101, 1102 (7th Cir.1990).

The record reflects that trustees McCollum, Leach, Eisha, Cremonesi, Lyzenga, Marczewski never met or spoke with any member of the Lansing Bible Church to discuss the purchase of the property, or any other matter, prior to the village's vote to make an offer, or prior to the Lansing Bible Church's vote on August 29, 1993. Defs.' Facts ¶¶ 20–25. Although the plaintiffs purport to dispute this fact, once again, they have not even attempted to identify evidence in the record to support the existence of a factual dispute. Accordingly, these facts are deemed admitted.

Notwithstanding their failure to properly controvert many of the factual averments offered by the defendants, the plaintiffs submit the following facts in their response to defendants' 12(M) statement.[6] Plaintiffs contend that, after the citizen's comment at the June 8, 1993 meeting regarding two potential buildings for a village youth center, the only initial response of the village was that West asked the village economic development director to check into the two proposed buildings. Pls.' Facts ¶ 5. Further, at the meetings of the village board on July 13, 20, and 23, at which the board discussed and approved budget appropriations for fiscal year 1993–1994 (July 13 and 23 meetings) and approved the final plans of an Ordinance that included phases of the Ridge Road TIF plan (July 20 meeting), there was no discussion, or appropriation, of funds for the purchase of a village youth center. *Id.* ¶¶ 6, 7, 8.

The plaintiffs further contend, and the record corroborates, that on August 17, 1993, prior to the village's vote to make an offer to purchase the property, West communicated to Trustees Cremonesi and Lyzenga that an offer had been made on the property by a

---

5. The plaintiffs response states that "[p]laintiffs do not accept as facts the assertions of ¶¶ 12, 13, 15 and 20–28 of the Defendants' Rule 12M Statement of Material Facts." Pls.' Facts ¶ 17. No citations to the record are provided in support of this statement.

6. The defendants made no effort to respond to the plaintiffs' submission, pursuant to Local Rule 12(N)(3)(b). Admittedly, the plaintiffs' submission is not readily characterized as either a Rule 12(N)(3)(a) response to the defendants' Rule 12(M) submission (which would not require a response by the defendants) or a Rule 12(N)(3)(b)

statement of additional facts (which would require a response or risk the peril that the additional facts be deemed admitted). Plaintiffs' submission is captioned "Rule 12N Statement of Additional Facts" thus plainly suggesting that it is intended to be a 12(N)(3)(b) submission, yet it also purports to respond (albeit inadequately) to the defendants' 12(M) statement. *See* Pls.' Facts ¶ 17. Unless controverted by the defendants' submission, all properly supported material facts set forth in the plaintiffs' submission will be deemed admitted.

black church from Chicago and that West also informed Trustee Eisha that an offer by a church from Chicago had been made on the property. *Id.* ¶¶ 12, 13.

Finally, as part of the church's settlement with the private defendants, the church contracted to purchase the property for $200,-000. Defs.' Facts ¶ 31. The village contends that the church never obtained financing to purchase the property because an underground storage tank was found on the property. Defs.' Facts ¶ 31. The village also maintains that the church has indicated that it would not purchase the property until the issue of the underground storage tank is resolved by the Lansing Bible Church. Defs.' Facts ¶ 31; Anderson Dep. at 82–83, 140–144. The church responds by stating that it has reserved a decision on whether to purchase the property until the underground storage tank has been investigated and also because of continued harassment and threats from unknown parties. Pls.' Facts ¶ 16; Bell Aff. ¶ 5.

## ANALYSIS

### Summary Judgment Standards

■ Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not signifi-

cantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513. With these standards in mind, we address the defendants' motion for summary judgment.

### COUNT III: § 1983

Plaintiffs seek recovery under the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging that defendants, under the color of state law, violated their equal protection rights to be free from discriminatory state action by acting with a discriminatory intent to prevent plaintiffs from purchasing property located in the village.[7] Compl. ¶¶ 32–33.

### Absolute and Qualified Immunity

■ Before delving into the merits of plaintiffs' § 1983 claims, we consider defendants' claims to immunity from suit. The defendants claim that West and the trustees are absolutely immune from damage suits under § 1983 because they were acting in their legislative capacities when they acted to approve an offer by the village to purchase the Lansing Bible Church property. Thus, the individual defendants claim to enjoy absolute legislative immunity under *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 402–06, 99 S.Ct. 1171, 1177–80, 59 L.Ed.2d 401 (1979) (holding that individuals acting in a legislative capacity at a regional level are entitled to absolute immunity) and *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951) (holding that state legislators are absolutely from suit under § 1983

7. 42 U.S.C. § 1983 provides in relevant part: Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, in suit in equity, or other proper proceeding for redress.

for actions "in the sphere of legitimate legislative activity").[8] Although § 1983 does not on its face admit a defense of official immunity, the Supreme Court has held that "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.'" *Buckley v. Fitzsimmons,* —— U.S. ——, ——, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993) (quoting *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951)). Since *Tenney,* the Supreme Court has recognized both absolute and qualified immunity under § 1983. *Id.* We address defendants' entitlement to these two types of immunity in turn.

### 1. *Absolute Immunity*

 The key inquiry when determining whether defendants are entitled to legislative immunity is whether the defendants' actions were taken in their "legislative capacity." *Rateree v. Rockett,* 852 F.2d 946, 950 (7th Cir.1988). "Administrative or executive acts of legislators are not protected." *Id. Rateree* teaches that we are to take a functional approach to resolving questions of absolute immunity: "'We look to the function the individual performs rather than his location within a particular branch of government.'" *Id.* at 951 (quoting *Aitchison v. Raffiani,* 708 F.2d 96, 99 (3d Cir.1983); *see also Buckley,* —— U.S. at ——, 113 S.Ct. at 2613 ("In determining whether particular actions of government officials fit within a common-law tradition of absolute immunity ... we have applied a 'functional approach' which looks to

'the nature of the function performed, not the identity of the actor who performed it.'") (quoting *Burns v. Reed,* 500 U.S. 478, 485, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991)); *Hansen v. Bennett,* 948 F.2d 397, 401 (7th Cir.1991) (noting that absolute legislative immunity is not available for activities "casually or incidentally related to legislative affairs but not a part of the legislative process itself"), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992). As the Seventh Circuit noted in *Rateree,* and as the instant case illustrates, line drawing between legislative acts on the one hand and administrative or ministerial acts on the other is often difficult. It is the burden of the officials invoking immunity to establish their entitlement to it. *Buckley,* —— U.S. at ——, 113 S.Ct. at 2613; *Walrath v. United States,* 35 F.3d 277, 281 (7th Cir.1994); *Rateree,* 852 F.2d at 950.

 To be clear, the question we confront here, is whether the individually named defendants were acting in a legislative capacity when they voted to authorize the mayor to send a letter of intent offering $260,000 for the subject property, contingent upon a certified appraisal and a bond counsel opinion.[9]

Both sides to this dispute draw on language neatly excerpted from various cases dealing with absolute immunity. Unfortunately, none of the cases bear even a remote similarity to the facts we confront here and the excerpted language does not take us particularly far. For their part, the defen-

---

**8.** In *Reed v. Village of Shorewood,* 704 F.2d 943, 952–53 (7th Cir.1983), the Seventh Circuit extended the reach of absolute legislative immunity to local legislators acting in their legislative capacity.

**9.** In arguing against defendants' entitlement to absolute immunity, plaintiffs state: "Plaintiffs allege that Defendants actively conspired with private Defendants to prevent Plaintiffs from purchasing the Lansing Bible Church property. This activity included meetings with private defendants, telephone conversations between and among the named Lansing Bible Church elders and the named Village of Lansing Trustees, and meetings with realtors. None of these activities can be considered legislative in nature." Pls.' Mem. at 7–8. We believe that plaintiffs are correct insofar as they suggest that the individually named defendants cannot claim absolute immunity with respect to the conspiracy allegations.

However, plaintiffs' § 1983 claim is separate and distinct from the conspiracy claim. The § 1983 claim rests on the allegation that the defendants violated plaintiffs' equal protection rights because the village's offer to purchase the subject property was motivated by an invidious discriminatory intent. Thus, we consider the allegations concerning the village's vote to authorize an offer separately from those concerning the conspiracy. And, in this regard, we note that the plaintiffs' allegations concerning the defendants' improper motives cannot defeat their claim to immunity. *See Tenney,* 341 U.S. at 377, 71 S.Ct. at 788 ("The claim of an unworthy purpose does not destroy the privilege".); *see also Rateree,* 852 F.2d at 951 ("Admittedly, a particular legislator may vote for legislation for seemingly improper reasons; nevertheless, the rule of absolute immunity shields this conduct.").

dants simply cite cases expressing the broad proposition that legislators are absolutely immune for actions taken in their legislative capacity. *See* Defs.' Mem. at 11 (citing *Lake Country Estates,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (regional planning authority members entitled to legislative immunity with respect to passage of land-use ordinance)); *Aitchison,* 708 F.2d 96 (3d Cir.1983) (mayor and borough attorney entitled to absolute legislative immunity with respect to decision to eliminate position of assistant building inspector); *Rateree,* 852 F.2d 946 (7th Cir.1988) (city commissioners entitled to absolute legislative immunity for eliminating appropriations from city budget that resulted in loss of plaintiffs' jobs—allegedly for political reasons); *Reed,* 704 F.2d 943 (7th Cir. 1983) (local liquor control commissioner entitled to absolute *judicial* immunity when passing on liquor license renewal and revocation questions). Unfortunately, defendants make little effort—beyond conclusory assertions—to reason why the board's act of authorizing the purchase offer at issue in this lawsuit falls within the scope of the holdings of these other cases or otherwise constitutes a legislative act.

■ Similarly, the plaintiffs invoke a number of equally inapposite cases (predominantly involving zoning-related decisions) from other circuits suggesting that when a legislative body takes an action directed at a particular individual or applies policy to a specific party—rather than establishing a general policy or prospective rule—it acts in an administrative or executive capacity rather than a legislative capacity. That, plaintiffs contend, is precisely what the board did in the instant case and hence they have no claim to legislative immunity. For the reasons that follow, we agree.

The Seventh Circuit has provided little guidance on applying the so-called functional approach to absolute legislative immunity; so, we shall begin our analysis by reference to guidance from the Supreme Court and the approaches of the other federal circuit courts. In a context not involving legislative immunity, the Supreme Court observed that "[t]he essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct." *Yakus v. United States,* 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944) (holding that the Emergency Price Control Act of 1942 did not unconstitutionally delegate the legislative power of Congress to the Office of Price Administration). Similarly, in *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908), the Court observed, "[l]egislation ... looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." Although voiced in different contexts, these statements are nonetheless instructive as to the meaning to be given to the expression "legislative capacity." *Yakus* and *Prentis* teach that at its core the legislative function involves determining, formulating, and making policy.

In accord with this proposition, several circuits have adopted approaches to analyzing claims of legislative immunity that, in one way or another, look to whether the defendant official was enacting or promulgating a policy or rule as opposed to simply enforcing, monitoring, or applying the policy. Thus, for example, in *Cinevision Corp. v. City of Burbank,* 745 F.2d 560 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985), the Ninth Circuit held that a city council was not acting legislatively when it voted to disapprove certain proposed concerts for the city's amphitheater because the council was merely monitoring and enforcing its contract with the concert promoter. *See also Zamsky v. Hansell,* 933 F.2d 677, 679 (9th Cir.1991) (holding that land use planning commission was not acting in a legislative capacity in requiring county to rezone certain property because that act involved "ad hoc decisionmaking" rather than "formulation of policy" such as would be involved in promulgating the state-wide planning standards).

Similarly, the Fourth Circuit recently reiterated its view that "a local governmental body only acts in a legislative capacity when it engages in the process of 'adopt[ing] prospective, legislative-type rules.'" *Roberson v. Mullins,* 29 F.3d 132, 135 (4th Cir.1994)

(quoting *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* 865 F.2d 77, 79 (4th Cir.1989)). The *Roberson* court also noted that "[e]very other court of appeals that has attempted to define when a local governmental body acts in a legislative capacity has set forth the same, or a very similar, standard." *Id.* (see cases cited therein).

The Third and Sixth Circuits also look to whether the challenged conduct involved policy-making decisions and additionally these circuits appear to also consider the scope of applicability of the rule or policy. Thus, for example, in *Ryan v. Burlington County, N.J.,* 889 F.2d 1286 (3d Cir.1989), the court remarked:

> There are two requirements which an act must meet in order to be regarded as legislative for immunity purposes. First, the act must be "substantively" legislative, *i.e.,* legislative in character. Legislative acts are those which involve policy-making decision of a general scope or, to put it another way, legislation involves line-drawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration. In addition, the act must be "procedurally" legislative, that is, passed by means of established legislative procedures.

*Id.* at 1291. *See also Haskell v. Washington,* 864 F.2d 1266, 1278 (6th Cir.1988) (noting in the context of a zoning action, "[i]f the underlying purpose of zoning activity is to establish general policy, then it is legislative … [i]f, however, the action singles out specifiable individuals and affects them differently from others, it is administrative.")

The foregoing review of the treatment of legislative immunity in other circuits is not intended to be a comprehensive summary or analysis. Rather, we have simply looked to these opinions for some guidance in approaching the issue. Our review leads us to conclude that an examination of whether the challenged act fundamentally involves policy-making as opposed to simply reflecting an ad hoc response to an issue confronting the governmental body is indeed a sound standard to determine whether legislative immunity is available.

Applying this standard, we find that the Lansing trustees' action in voting to approve the making of an offer to purchase the property does not constitute legislative action. In the first place, it simply cannot be said that the vote concerned the enactment or promulgation of public policy. The defendants certainly do not argue to the contrary. Instead, they simply argue as follows:

> A legislative act is required in Illinois for a municipality to contract to purchase property. The power to contract to purchase property is given to Illinois municipalities by § 11–61–3 of the Illinois Municipal Code, (65 ILCS 5/11–61–3) and the statute requires that the power to purchase real property be exercised "by ordinance adopted by an affirmative vote of two-thirds of the elected corporate authorities then holding office."

Defs.' Mem. at 11–12.

Defendants' contentions in this regard fail to address the nature of the specific action that is challenged in this suit and thereby completely disregard the well-established propositions that not all acts that happen to be done by legislators are necessarily legislative acts for purposes of establishing legislative immunity, *Roberson,* 29 F.3d at 134 ("Not all actions undertaken by local governmental bodies that have legislative responsibilities are necessarily 'legislative.' "); *Cinevision,* 745 F.2d at 580 ("not all governmental acts by a local legislator, or even a local legislature, are necessarily legislative in nature"); *Trevino v. Gates,* 17 F.3d 1189, 1191 (9th Cir.1994) (same), and the fact that the legislator voted on the issue does not necessarily establish that he or she was acting in a legislative capacity. *See, e.g., Cinevision,* 745 F.2d at 580 ("although a local legislator may vote on an issue, that alone does not necessarily determine that he or she was acting in a legislative capacity"); *accord Smith v. Lomax,* 45 F.3d 402, 406 (11th Cir.1995); *Brown v. Griesenauer,* 970 F.2d 431, 436–37 (8th Cir.1992); *Roberson,* 29 F.3d at 134 n. 3 ("A member of a local governmental body does not necessarily act in a legislative capacity when his partic-

ipation takes the form of a vote; the action of the body must itself be legislative"). Thus, we find that the fact that the Illinois municipal code requires a vote of the elected body in order to purchase property sheds little or no light on the relevant inquiry. *Cf. Brown*, 970 F.2d at 437 (finding that "[a]lthough state law entrusts the board of aldermen with the authority to impeach the mayor, we do not think that impeachment is a truly legislative act; it is instead an act that happens to have been done by legislators").

Based on the record developed in this case, the Court can discern no enactment or promulgation of public policy in the defendants' authorization to make an offer to purchase the Lansing Bible Church property. The public policy, if any, that is associated with the purchase of this property lies in the defendants' determination that a youth center would be of benefit to the Lansing community. The purchase of a parcel of property to serve as the site for the youth center is merely an administrative act in furtherance of that policy. Accordingly, we conclude that the individual defendants' actions in approving the purchase offer were administrative, not legislative, in nature and therefore the defendants are not entitled to absolute legislative immunity.

### 2. Qualified Immunity

 Absent the availability of absolute immunity, defendants contend that they are entitled to qualified immunity. Government officials sued in their individual capacities are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). We find defendants' claim to qualified immunity entirely without merit. Defendants plainly should have known that ac-

tions motivated by racial animus to preclude African–Americans from owning property in the village would violate the plaintiffs' equal protection rights. *Cf. Progress Development Corp. v. Mitchell*, 286 F.2d 222, 230–231 (7th Cir.1961) (finding a racially-motivated attempt to acquire property via eminent domain to be actionable); *de Furgalski v. Siegel*, 618 F.Supp. 295, 300 (N.D.Ill.1985) (allegations that defendants established certain zoning restrictions in order to limit black property ownership stated a claim under § 1983). That the defendants allegedly employed a novel approach—outbidding potential African–American owners—to effectuate their allegedly discriminatory objective does not alter the conclusion that they should have known that acting with discriminatory animus is clearly forbidden.

Having determined that the individual defendants are entitled to neither absolute nor qualified immunity, we now turn to consider plaintiffs' § 1983 claim on the merits.

### § 1983 Liability

 Liability under § 1983 requires proof that ' "(1) the defendants acted under color of state law, (2) defendants' actions deprived plaintiffs of [their] rights privileges or immunities guaranteed by the Constitution, and (3) defendants' conduct proximately caused plaintiffs' deprivation.' " *Volk v. Coler*, 845 F.2d 1422, 1430 (7th Cir.1988) (quoting *Webb v. City of Chester, Illinois*, 813 F.2d 824, 828 (7th Cir.1987)). Plaintiffs must also prove that the defendants' discriminatory conduct was intentional. *Id.* at 1430–31; *see also Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Additionally, to establish the village's liability under § 1983, the plaintiffs must demonstrate that the constitutional deprivation was caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the village's] officers." [10]

---

10. Plaintiffs, in addition to suing the village, bring this claim against West and trustees McCollum, Leach, Eisha, Cremonesi, Lyzenga and Marczewski in both their official and individual capacities. While official capacity suits, in effect, represent only another way of pleading an action against an entity of which an official is an agent, individual capacity suits seek to impose

personal liability upon government officials for actions taken under the color of state law. *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). To establish individual liability under § 1983, "it is enough to show that the official acting under color of state law, caused a deprivation of a federal right." *Id.* at 166, 105 S.Ct. at 3105.

*Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978); *Bergren v. City of Milwaukee,* 811 F.2d 1139, 1142 (7th Cir. 1987). While it is undisputed that defendants acted under the color of state law, defendants deny that their actions intentionally deprived the plaintiffs of their equal protection rights or that their actions caused the plaintiffs' alleged injuries.

### A. *Discriminatory Intent*

■ Plaintiffs contend that the village's offer was motivated by racial animus and that the offer was designed to preclude them from purchasing property in the village in violation of their Fourteenth Amendment equal protection rights. Pls.' Resp. Mot.Summ.J. at 9. Defendants argue that the village's action of bidding on the property owned by the Lansing Bible Church did not deprive the church of a constitutionally protected right. According to defendants, the church had no constitutionally protected right to be free from competition in its attempt to purchase property.

■ We turn directly to the issue of whether the plaintiffs have adduced sufficient evidence to create a triable issue as to defendants' intent to discriminate as we find this issue to be dispositive. We are mindful, of course, that courts have approached the application of summary judgment standards with caution in civil rights actions where the issue is one of intent, and have infrequently found summary disposition to be appropriate in such cases. *See, e.g., Powers v. Dole,* 782 F.2d 689, 693 (7th Cir.1986). As noted by the court in *Powers,* "[t]he factual issues presented in such litigation, including the issue of discriminatory intent, which is often proved by circumstantial evidence, cf. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), cannot often be resolved on summary judgment." *Id.* However, as the court further noted, "even when such issues of motive or intent are at stake, summary judgment is proper 'where the plaintiff presents no indication of motive or intent supportive of his position.'" *Id.* at 694 (quot-

ing *Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985)).

■ Whether an inference of discriminatory intent can be supported must be determined from the "totality of the relevant facts." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976); *see Arlington Heights,* 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Discriminatory intent need not be the sole purpose motivating the challenged conduct, as long as the discriminatory purpose was a motivating factor in the decision. *Hunter v. Underwood,* 471 U.S. 222, 231–232, 105 S.Ct. 1916, 1921–22, 85 L.Ed.2d 222 (1985). Discriminatory intent, however, implies more than "intent as volition or intent as awareness of consequences." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). As the Supreme Court stated in *Feeney,* discriminatory intent implies that "the decision maker ... selected or reaffirmed a particular course of action at least in part 'because,' not merely 'in spite of' its adverse affects upon an identifiable group." *Id.* (citations omitted).

■ When evaluating indirect evidence of discrimination in equal protection cases under § 1983, the entire context of the allegedly discriminatory actions must be considered. *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. *Arlington Heights* enumerates several factors that may provide indirect evidence of discrimination, including: the historical background of the decision, particularly if such background reveals a series of official actions taken for invidious purposes; the specific sequence of events leading up to the challenged decision; departures from normal procedures and substantive departures if the factors usually considered important strongly favor a contrary decision; and legislative or administrative history. *Id.* at 267–268, 97 S.Ct. at 564–65.

■ As in most discrimination cases, the plaintiffs have no direct evidence of discriminatory intent and hence they rely on circumstantial evidence. That evidence is extremely scant, and, in the final analysis, insufficient to support a reasonable finding in favor of

the plaintiffs. The principal evidence relied upon by the plaintiffs is that Fritz—the Lansing Bible Church elder who contacted Mayor West—made reference in his conversation with West to the fact that it was a "black church from Chicago" that had made an offer on the property, and that West, in turn, relayed this information to two other trustees shortly before the board voted to make an offer on the property. This evidence—and this is most certainly the plaintiffs' most telling evidence—does nothing more than establish that the defendants acted with an awareness that the other bidder for the property was a "black church." However, it is well-established that awareness is not equivalent to discriminatory intent. As *Feeney* teaches, in order to prevail on an equal protection claim the plaintiffs must present more evidence than that which merely evinces that the defendants were aware of their race. They must present evidence supporting the inference that defendants acted because of their race. In this regard, we note that there is not a shred of evidence indicating that Fritz, West, or any of the trustees harbored any racial animus. There is, for example, no history, of discriminatory acts to which plaintiffs can point nor is there any contemporaneous evidence of discriminatory animus. Thus, the court finds that the evidence amounting to no more than that a reference to plaintiffs' race was made in discussing that a bid had been placed on the property is insufficient to raise a triable issue as to intent. Of course, we must consider the totality of the evidence; so, we proceed to consider whether plaintiffs' other evidence in conjunction with the foregoing can support a reasonable finding of discriminatory intent.

The plaintiffs contend that the sequence of events leading up to the village's vote adds further evidence of discriminatory intent. Specifically, plaintiffs point out that, although the property was on the market for approximately 14 months prior to the church's offer, the village did not make an offer on the property until approximately four days after West became aware of the church's offer on the property. This argument, however, cannot withstand scrutiny. In the first place, the reference to the fact that the property had been on the market for 14 months prior

to the church's offer in August of 1993 is somewhat of a red herring in view of the record which indicates that the issue of a youth center for the village first arose during the village elections in the spring of 1993. Thus, the fact that the property was listed prior to that time is largely immaterial. Moreover, the record also reflects that the first time the possibility of purchasing the church was raised before the board was in June of 1993, when an audience member at a board meeting suggested looking into the property. Thus, the plaintiffs' suggestion that the board evidenced no interest in the property for 14 months is not borne out by the record. More accurately, the record reflects that the village took no action towards investigating or purchasing the property for approximately 3 months. We find this evidence marginally probative at best. Similarly, the fact that the village overcame its inertia only after Fritz informed West that a bid had been placed on the property and that if the village was really interested it had better act quickly, is also rather unremarkable.

The plaintiffs point out that the village did not discuss appropriations nor did it appropriate funds for the acquisition of the property prior to the board's vote to make an offer on the property. Pls.' Facts ¶¶ 6, 7, 8. In the absence of any showing that this was atypical or reflected a departure from normal procedure, this evidence is completely nonprobative.

Finally, the Court has evaluated whether the fact that the village offered the "asking price" is sufficient, along with the other known facts, to present a material issue of dispute regarding the defendants' discriminatory intent. Certainly, offering the asking price of $260,000 when the competing bid of the plaintiffs was only $230,000 raises some question. However, the undisputed facts show that the village's offer was contingent on an appraisal indicating that the subject property was in fact worth $260,000. The contingency contained in the village's offer undermines any inference of discriminatory intent that a jury may otherwise have drawn from the village's asking price offer. Additionally, the fact that the plaintiffs subse-

quently matched the village's offer shows that the village's offer was reasonable in relation to the value of the property and not motivated by discriminatory intent.[11]

Viewing the totality of this circumstantial evidence in a light most favorable to the plaintiffs, we find that it is insufficient to raise a genuine issue of material fact regarding discriminatory intent of the part of the defendants. The evidence establishes that the defendants acted with an awareness of plaintiffs' race and little more. There is no evidence of a history of racially motivated action by the village or the individually named defendants. The sequence of events culminating in the defendants' offer is not sufficiently probative of discriminatory intent and there is no evidence that the defendants' actions constituted a departure from normal board procedures. The evidence unquestionably supports the inference that the defendants intended to out bid the plaintiffs for the property and did so with an awareness of the plaintiffs' race; however, the evidence that the defendants' intention to out bid the plaintiffs was motivated by racial animus is colorable at best and cannot support a reasonable finding of discriminatory intent. Accordingly, summary judgement in favor of all defendants must be granted as to plaintiffs' claims under 42 U.S.C. § 1983.[12]

*COUNT IV: § 1985(3)*

 Plaintiffs seek recovery under 42 U.S.C. § 1985(3) [13], alleging that defendants West, McCollum, Leach, Eisha, Cremonesi, Lyzenga and Marczewski, acting in their individual capacities [14], conspired with each other and the private defendants Fox, Kruger, Fritz and the Lansing Bible Church, to deprive plaintiffs of their Fourteenth Amendment equal protection rights. Compl. ¶ 34–35. In order to establish liability under § 1985(3), plaintiffs must prove four elements: (1) a conspiracy; (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges an immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to the person property or a deprivation of any right or privilege of a citizen of the United States. *United Brotherhood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 828–829, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983); *Quinones v. Szorc*, 771 F.2d 289 (7th Cir.1985). Moreover, to establish a prima facie case of a civil conspiracy, a plaintiff must show "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437 (7th Cir.1987); *see also Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir.1979).

 The plaintiffs are not required to prove that each participant in the conspiracy knew "the exact limits of the illegal plan or the identity of all the participants." *Hoffman–LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir.1971). The plaintiff must, however, prove that there is a single plan,

---

**11.** The fact that the plaintiffs' matching offer was rejected by the private defendants may be evidence of the private defendants' discriminatory animus but it does not assist the plaintiffs in defending against the motion presently before the Court.

**12.** Because we conclude that plaintiffs' evidence is insufficient to raise a genuine issue as to discriminatory intent we need not consider defendants' alternative arguments for avoiding liability such as the lack of proximately caused injuries.

**13.** 42 U.S.C. § 1985(3) provides in relevant part:

If two of more persons in any state or Territory conspire ... for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**14.** West and the trustees may not be found liable in their official capacities for agreement among themselves to make an offer for the building because officials acting in their official capacities cannot conspire with each other. *Terry v. Atlas Van Lines*, 679 F.Supp. 1467 (N.D.Ill.1986); *cf. Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972) (stating that "if the alleged overt act is a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by § 1985(3)").

"the essential nature and general scope of which is known to each person who is to be held responsible for its consequences." *Richardson v. City of Indianapolis,* 658 F.2d 494 (7th Cir.1981). A conspiracy may be proven by circumstantial evidence and should not be taken from the jury as long as there is a possibility that a jury can reasonably infer from the circumstances that the required elements of conspiracy have been met. *Hampton,* 600 F.2d at 621. However, mere allegations of a conspiracy are insufficient to withstand a motion for summary judgment. *House v. Belford,* 956 F.2d 711, 720 (7th Cir.1991). Likewise, in an action against a government official, conspiracy cannot simply be inferred on the basis of an official's position. *Bell v. City of Milwaukee,* 746 F.2d 1205, 1255 (7th Cir.1983).

In order to establish a conspiracy, the plaintiffs must present sufficient evidence to show defendants West, McCollum, Leach, Eisha, Cremonesi, Lyzenga and Marczewski, acting in their individual capacities, conspired amongst themselves or with Fox, Kruger, Fritz and the Lansing Bible Church to deprive plaintiffs of their equal protection rights.

■ The plaintiffs in the instant case claim that West and the trustees conspired with the private defendants to prevent the plaintiffs from purchasing the property because of their race. Compl. ¶ 16. The plaintiffs allege that circumstantial evidence shows that after West became aware that the church had made an offer to purchase the property, West "immediately set into motion the actions necessary" to stop the purchase by the church and that "[e]ach meeting and phone call leading to and including the vote to make an offer on the Lansing Bible Church property was an overt act sealing the conspiracy." Pls.' Mem.Opp.Summ.J. at 11.

Plaintiffs' conspiracy claims are wholly unsupported by the record. The plaintiffs do not controvert the following facts: (1) the only discussions West had with any member of the Lansing Bible Church pertaining to

the purchase of the property were his two conversations with Fritz [15] and one conversation with Besse; and (2) other than West, the village trustees never met or spoke with any of the private defendants to discuss the purchase of the property or any other matter prior to the board's vote or the Lansing Bible Church board's vote. Further, both Fritz and Besse attest that they never discussed with West whether the village would or should purchase the property to prevent the plaintiffs from doing so because of their race. Fritz. Aff. ¶ 5; Besse Aff. ¶ 6. Besse's affidavit further states that he did not discuss the plaintiffs' race with West at all. Besse Aff. ¶¶ 4, 5. Thus, the extent of plaintiffs' showing as to the existence of a conspiracy between the individually named defendants and the Lansing Bible Church defendants to deprive plaintiffs of their equal protection rights is that Fritz mentioned to West that a black church from Chicago had made an offer on the property. Similarly, plaintiffs' only showing of a conspiracy amongst the individually named defendants themselves is that West mentioned to two of the trustees that the offer made on the property was made by a black church, and West told one trustee that a church from Chicago had made the offer. Because the Court finds that no reasonable factfinder could return a finding of a conspiracy based on this evidence, summary judgment in favor of the defendants is granted with respect to plaintiffs' conspiracy claims under 42 U.S.C. § 1985(3).

*COUNT V: § 1986*

■ Liability under 42 U.S.C. § 1986 presupposes the existence of a conspiracy. *Bell v. City of Milwaukee,* 746 F.2d at 1256. Indeed, § 1986 "merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985." *Williams v. St. Joseph Hospital,* 629 F.2d 448 (7th Cir.1980). Because the Court concludes that there is no genuine issue of material fact as to the existence of a conspiracy, summary judgment on count V, the § 1986 claim, is also warranted and therefore granted.

---

**15.** The two conversations were West's initial meeting with Fritz on August 13, 1993 and a telephone call by Fritz to West sometime between August 22 and August 29, 1993, in which Fritz informed West that the Lansing Bible Church would vote on the pending offer on August 29, 1993.

## CONCLUSION

This Court is extremely sympathetic to the plight of the plaintiffs in this case. The Court is also somewhat suspicious of the defendants' actions in this matter. Unfortunately, however, sympathy and mere suspicion are not proper factors for this Court to rely upon in deciding this motion. For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. This action is dismissed with prejudice, each party to bear their own costs.